Robert V. ADAMS, et al., Plaintiffs,

v.

NVR HOMES, INC., t/a Ryan Homes, et al., Defendants.

No. CIV H–99–846.

United States District Court, D. Maryland.

March 23, 2001.

Robert Brager, Pamela D. Marks and Beveridge & Diamond, P.C., Baltimore, Maryland, for plaintiffs.

Steven A. Allen, Randall M. Lutz and Hodes, Ulman, Pessin & Katz, P.A., Towson, Maryland and Arnold M. Weiner and Snyder, Weiner, Weltchek, Jacobs & Slutkin, Baltimore, Maryland, for the Ryan Defendants.

Susan M. Souder, Catonsville, Maryland, for the Brantly Defendants.

Terrence M. McShane and Lee & McShane, P.C., Washington, D.C., for Third–Party Defendant Gutschick.

## MEMORANDUM AND ORDER

ALEXANDER HARVEY, II, Senior District Judge.

In this multi-party case, families residing in a residential development in Howard County, Maryland seek recoveries from certain home builders who developed, built and marketed the homes in which the plaintiffs live. In addition to the many claims asserted by the plaintiffs, cross-claims and third-party claims are also at issue in this case.

Suit was originally brought here by the members of seventeen different families who reside in the Calvert Ridge development which is located in Elkridge, Howard County. In their amended complaint, plaintiffs allege that their homes were built on a solid waste dump and that defendants concealed the properties' past use and contamination from them when they bought their homes. Substantial compensatory and punitive damages as well as injunctive and other relief are sought by plaintiffs under both federal and state law.

Fourteen of the families (the "Ryan Families") reside in homes developed, built or marketed by defendants NVR, Inc. ("NVR") and NVR Homes, Inc. ("NVR Homes"), corporate entities which do business in Maryland under the trade name "Ryan Homes". These defendants will be referred to herein as the "Ryan Defendants." Three of the families (the "Brant-

ly Families") reside in homes developed, built or marketed by defendants Brantly Development Group, Inc. ("Brantly Development"), Brantly Management Group, Inc. ("Brantly Management") and Nantucket Island Homes, Inc. ("Nantucket"). Also named as defendants are John Liparini, who is President and a director of those Brantly corporations, and Nick Liparini, a private contractor who is the son of John Liparini. All five of these defendants will be referred to herein as the "Brantly Defendants."

The Ryan Defendants have filed an amended cross-claim against six cross-defendants, namely Brantly Development, Brantly Management, Nantucket, Marshalee Woods Limited Partnership ("Marshalee")[1] and the two Liparinis. The Brantly Defendants and Marshalee in turn have filed a cross-claim against the Ryan Defendants. Brantly Development and Nantucket, two of the defendants named in the amended cross-claim of the Ryan Defendants, have filed third-party claims against three engineering firms, namely Hillis–Carnes Engineering Associates, Inc. ("Hillis–Carnes"), MAFI Associates, Inc. ("MAFI") and Gutschick, Little & Weber, P.A. ("Gutschick").

There have been extensive pretrial proceedings in the case. In its Memorandum and Order of February 17, 2000, this Court granted in part and denied in part the Brantly Defendants' motion to dismiss, and also granted in part and denied in part the Ryan Defendants' motion to dismiss. *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243 (D.Md.2000). A settlement has now been reached between the plaintiffs and the Brantly Defendants, including Marshalee. However, the six Brantly cross-defendants remain as parties in this case as a result of their cross-claims asserted against the Ryan Defendants and also as a result of the cross-claims asserted against them by the Ryan Defendants. There has also been a settlement of the third-party claims asserted by Brantly Development and Nantucket against Hillis–Carnes. Moreover, the third-party claims against MAFI have been severed. Accordingly, the only third-party claims presently before the Court at this time are those of Brantly Development and Nantucket against Gutshick.

Extensive discovery has been undertaken by the parties. The following eight motions for summary judgment or partial summary judgment are now pending before the Court:

(1) Plaintiffs' motion for partial summary judgment on Count I of the amended complaint;

(2) Plaintiffs' motion for partial summary judgment on Counts VIII, IX and X of the amended complaint;

(3) The Ryan Defendants' motion for summary judgment on all counts of the amended complaint;

(4) The Ryan Defendants' motion for summary judgment on the cross-claims of the Brantly Defendants and Marshalee;

(5) The motion for summary judgment of cross-defendants John Liparini and Nick Liparini on the cross-claims asserted against them;

(6) The motion for summary judgment of cross-defendants Brantly Development and Marshalee on the cross-claims asserted against them;

(7) The motion for summary judgment of cross-defendants Brantly Manage-

---

**1.** Brantly Development is a general partner of Marshalee, and John Liparini and his wife are

joint limited partners.

ment and Nantucket on the cross-claims asserted against them; and

(8) The motion for summary judgment of third-party defendant Gutschick on the third-party claims asserted against it by Brantly Development and Nantucket.

Lengthy memoranda and voluminous exhibits have been submitted by the parties in support of and in opposition to these pending motions for summary judgment or partial summary judgment. A massive record has been presented to the Court, and lengthy oral argument has been heard. For the reasons to be stated herein, the Court has concluded that some of these pending motions must be granted and others denied. It is apparent to the Court that some of plaintiffs' claims, some of the parties' cross-claims and the third-party claims pending here must all proceed to trial.

## I

### Facts

From the 1940's and continuing until the early 1970's, some of the land located in Howard County which today constitutes the Calvert Ridge subdivision development was the site of a sand and gravel surface mine operation (the "quarry"). Pits of approximately twenty to thirty feet in depth were excavated during the mining operations which ceased in the early 1970's. From time to time, solid waste was deposited in the pits and on other portions of the quarry land.

The Calvert Ridge subdivision is located on approximately twenty-four acres of land in Elkridge, Howard County, Maryland. The subdivision contains twenty-six lots, seventeen of which are involved in this litigation. Pursuant to their settlement agreement with the plaintiffs, the Brantly Defendants and Marshalee have now agreed to purchase Lots 21, 22, and 23, which contain homes built by Nantucket and owned by the three Brantly Families. The other fourteen lots are owned by the Ryan Families. The Adams family recently entered into a contract to sell Lot 15, and the Muller family recently entered into a contract to sell Lot 19.

Helen O'Connor owned the land comprising the Calvert Ridge subdivision from 1945 until October 1995, when the site was purchased by Brantly Development. A three to four acre parcel of land in the center of the property had been used for the earlier sand and gravel mining operations. In 1973, the O'Connor family began reclaiming the quarry by using dirt, tree stumps, asphalt, concrete and tires as fill material. By the late 1980's the quarry had been completely filled and covered with topsoil.

In late 1991, John Liparini began discussions with Thomas O'Connor, Helen O'Connor's grandson, regarding the purchase of the Calvert Ridge property. Thomas O'Connor informed John Liparini that at one time a portion of the property had been used as a sand and gravel quarry but had since been filled with tree stumps, concrete, asphalt, and general construction debris. John Liparini also reviewed two subsurface investigation reports prepared by Hardin–Kight Associates, Inc. ("Hardin–Kight") in May 1989 and January 1991.

In October 1992, Hardin–Kight completed a third evaluation of subsurface conditions at the Calvert Ridge property on behalf of Brantly Development. This study estimated that "35,000 cubic yards of unsuitable fill would have to be undercut and replaced below building pads." It was also reported that "a decaying organic odor (faint to strong) was encountered in all of the [test] pits," and "alternate foundation systems for the proposed single

family dwellings may be used on the site if the odors are not problematical."

In the summer of 1993, Geo–Technology Associates, Inc. examined the Calvert Ridge site on behalf of Centex Homes, another builder. This report concluded that "[d]ue to the presence of existing fill materials, ... the majority of the site is not suitable for development without some improvement to soil condition. Deep undercuts and soil replacement or deep foundation alternatives may be necessary to render the site suitable for structural support." In addition, it was determined that the "site is a further liability with regard to the unknown nature of the existing fill materials," and it was strongly recommended that "a more thorough exploration of the site conditions be conducted to evaluate geotechnical as well as environmental issues associated with the development of the subject property."

As a result of these studies, John Liparini decided not to buy the property in 1992 or 1993 because the overall cost of developing the Calvert Ridge subdivision would have been too expensive in light of the additional costs associated with removing and replacing fill in areas where structures were to be built. By 1995, however, the price of the Calvert Ridge property had decreased, and on July 17, 1995, John Liparini as President of Brantly Development executed an agreement on behalf of Brantly Development to purchase the Calvert Ridge property from Helen O'Connor. Shortly thereafter, Eco Dynamics, Inc. ("Eco Dynamics") conducted a Phase I Environmental Site Assessment for Brantly Development's financial lender, Signet Bank/Maryland.

According to the Eco Dynamics report of September 1995, "[t]he assessment was performed to fulfill the due diligence requirements under the Superfund Amendments and Reauthorization Act of 1986 (SARA), and in order to insure that Signet Bank/Maryland is covered by the 'innocent landowner defense' provision of SARA." The assessment concluded that the Calvert Ridge site did not contain any hazardous materials or environmental contamination. Accordingly, on October 5, 1995, Brantly Development completed the purchase of the Calvert Ridge property from Helen O'Connor.[2]

Beginning in late 1995, Brantly Development improved the Calvert Ridge subdivision by hiring contractors to grade lots, construct roads, prepare building pads, and install water, sewer, electric and natural gas lines. Hillis–Carnes prepared most of the building pads by excavating any uncontrolled fill and replacing it with compacted fill. For some of the lots which were located over the former quarry, MAFI was hired to install Tensar Geogrid reinforcements under the building pads in order to counteract the possible formation of sink holes due to the existence of unstable fill material.[3] Both John and Nick Liparini directed and supervised all development work.

On September 5, 1995, Marshalee entered into a Contract of Sale with NVR Homes, Inc. for the sale of fifty-one lots to NVR Homes, Inc. ("Contract of Sale"). These lots were located in a subdivision known as "Marshalee Woods, Section Two, Area Two", which was not a part of but

2. The purchase agreement between Brantly Development and Helen O'Connor stated that the land had not been used for "the storage, treatment, or disposal of hazardous substances."

3. "Geogrid" reinforcements were used on nine lots, including Lots 8, 21, 22 and 23. The Ryan Defendants built the home on Lot 8. Nantucket built the homes on Lots 21, 22 and 23.

was adjacent to the Calvert Ridge subdivision. On the same date, Marshalee also entered into a Land Development Contract with NVR Homes, Inc. whereby Marshalee would develop and improve the Marshalee Woods subdivision in which the fifty-one lots were located ("Land Development Contract").

In the summer of 1996, the Ryan Defendants entered into negotiations with John Liparni to purchase lots at Calvert Ridge. At the time, John Liparini informed the Ryan Defendants of the existence of the reclaimed quarry, and he told them that it did not pose any environmental problems because hazardous waste had not been detected on the site. John Liparini also gave the Ryan Defendants a copy of Eco Dynamic's September 1995 Phase I Environmental Site Assessment and informed them of a July 24, 1996 supplement, which reiterated that there were no hazardous materials or environmental contamination at the site. John Liparini did not at the time give the Ryan Defendants copies of the 1989, 1991 and 1992 Hardin–Kight reports nor did he give them the 1993 Geo–Technology Associates' report.

On September 19, 1996, the Ryan Defendants purchased ten lots which were located within the Calvert Ridge subdivision. As a matter of convenience, John Liparini and the Ryan Defendants agreed to consummate this transaction by simply attaching an addendum to both the Contract of Sale and the Land Development Contract.

In November of 1997, the Ryan Defendants purchased eleven additional Calvert Ridge lots, some of which were located over the reclaimed quarry. Brantly Development provided lot certifications from MAFI and Hillis–Carnes for the lots which were located over the former quarry. Again, the parties attached an addendum to both the Contract of Sale and the Land Development Contract instead of drafting new contracts.

According to these contracts and the addenda, the Ryan Defendants would be primarily responsible for improving individual lots, while Brantly Development would be responsible for improving the overall subdivision. For instance, Brantly Development would continue to install sewer, water, electric, telephone and utility lines throughout Calvert Ridge, and the Ryan Defendants would be required to connect to these lines each house which they constructed.

The Ryan Families signed purchase agreements for their homes in Calvert Ridge between April 21, 1996 and December 31, 1997, and their actual settlement dates occurred between February 28, 1997 and June 25, 1998. Eight of the purchase agreements contain an express warranty limitation provision which disclaims any warranty or representation not contained in the "Ryan Homeowners Manual." Although the other six purchase agreements also contain a limited warranty provision, the disclaimer of oral statements and promises is located in a separate and independent provision. Each of the Ryan Families in addition executed a General Addendum to their purchase agreement which disclaims any oral statements, representations, warranties or promises.

Karen Hensel ("Hensel"), Catherine Taylor ("Taylor") and Jack Rupp ("Rupp") were the sales representatives who, acting on behalf of the Ryan Defendants, sold homes to the Ryan Families. Neither Hensel nor Taylor was aware that a portion of the Calvert Ridge subdivision had formerly been used as a sand and gravel quarry. Rupp, however, had been informed by Kevin Kerwin, the division manager for Ryan Homes, that construction debris was buried near Lots 7, 8, 9, 10, 11 and 12.

Prior to the purchase of their houses, none of the Ryan Families was told that part of the Calvert Ridge subdivision was located over a reclaimed quarry. Five of the Ryan Families were informed that the property had been used as a "farm" and four other Ryan Families were informed that the site had been a "horse farm." [4]

On September 2, 1998, three houses in the Calvert Ridge subdivision were evacuated after elevated levels of methane gas were detected in the basement of each house.[5] The Howard County Fire Department tested fourteen other houses that same day but did not detect methane in any of those homes.[6] Within the next two days, the Ryan Defendants purchased natural gas detectors, four of which were installed in each of the homes of the Ryan Families. Two detectors were placed in each basement, and one on each of the first and second floors.

Over the next two months, the Ryan Defendants sealed the basement floors of all fourteen of the Ryan Families' houses, and installed a passive ventilation system in eleven of the houses.[7] The Ryan Defendants also engaged two engineering firms, Hillis–Carnes and Brook Environmental, and several independent experts to evaluate the methane problem at Calvert Ridge. Indoor and outdoor air sampling was conducted, and on November 10, 1998, Hillis–Carnes completed a report which was distributed to each of the Ryan Families and to experts retained by the Ryan Defen-

dants. Based upon this report, it was determined that portions of Lot 11, which is not involved in this litigation, were the primary source of the methane generation.

In December 1998, the Ryan Defendants, the Brantly Defendants and Marshalee excavated parts of Lot 11. The excavated materials, which included chunks of concrete, two empty drums, some metal objects, tires, tree stumps, branches and leaves, were taken to a landfill offsite. The excavated areas were then filled with new clean material.

The Environmental Protection Agency ("EPA") and the Maryland Department of the Environment ("MDE") have each investigated conditions at Calvert Ridge. No solid waste problem was found to exist. The EPA closed its file in June of 1999, and the MDE closed its file in August of 1999.

Since September 2, 1998, the Howard County Fire Department, plaintiffs' experts, defendants' experts, and plaintiffs themselves, have tested the Ryan Families' homes for the presence of methane on more than 175 occasions. All of these tests have been negative except for one test on September 9, 1998, in which methane was detected at a level of 2% in the basement of the house on Lot No. 8 owned by plaintiff Ratliff. Over the same period, however, plaintiffs' natural gas detectors have alarmed dozens of times, and elevated levels of methane gas have occasionally

4. A horse farm is in fact located adjacent to the Calvert Ridge neighborhood.

5. The three houses are located on Lots 9, 11 and 12, but none of these Lots are involved in this litigation.

6. Methane gas is not toxic or poisonous, and in fact, a small percentage of the atmosphere consists of naturally occurring methane gas. However, when the percentage of methane in the atmosphere reaches at least 5% (the Low-

er Explosive Limit or LEL), an explosion can then occur if the methane is mixed with oxygen in a confined space and ignited by a spark. Also, high concentrations of methane can lead to asphyxiation by displacing the oxygen that humans need to breathe.

7. Plaintiff Banfer rejected the Ryan Defendants' offer to install a passive ventilation system, and plaintiffs Rowe and Lee already had such systems in their homes.

been detected in the yards of certain Calvert Ridge homes.

According to plaintiffs, sales representatives of the Ryan Defendants made fraudulent and misleading statements to them or omitted providing material information to them concerning the quality and former use of the property which they were purchasing. It is alleged in the amended complaint that the acts and omissions of the defendants with regard to the presence of solid waste at the Calvert Ridge site were fraudulent and were undertaken with reckless disregard for the health and safety of the plaintiffs. According to the amended complaint, each defendant directed or actively participated and cooperated in the negligent conduct and wrongful actions and omissions of the other defendants.

## II

### The Pending Claims, Cross–Claims and Third–Party Claims

The amended complaint contains fourteen counts. Several of these counts were dismissed by the Court in its Memorandum and Order of February 17, 2000. *Adams*, 193 F.R.D. at 257. Other counts have been voluntarily dismissed by the plaintiffs. Accordingly, there are now ten counts in the amended complaint which allege claims against the Ryan Defendants and which remain pending in this case, as follows:

*Count I*—Federal Solid Waste Law

*Count III*—Public Nuisance

*Count V*—Fraud

*Count VI*—Concealment

*Count VII*—Negligent Misrepresentation

*Count VIII*—Consumer Protection—Unfair or Deceptive Trade Practices

*Count IX*—Breach of Contract

*Count X*—Breach of Implied Warranties

*Count XI*—Breach of Express Warranties

*Count XII*—Negligence

The following cross-claims have been asserted by the Ryan Defendants against some of the Brantly Defendants and Marshalee:

*Count I*—Breach of warranty against Marshalee and Brantly Development

*Count II*—Express indemnity against Marshalee and Brantly Development

*Count III*—Joint tortfeasor liability against Brantly Development, Brantly Management, Nantucket, Marshalee, John Liparini and Nick Liparini.

The Brantly Defendants and Marshalee have in turn alleged cross-claims of contribution and indemnity against the Ryan defendants.

The amended third-party complaint of Brantly Development and Nantucket asserts the following claims against third-party defendant Gutschick:

*Count I*—Breach of contract

*Count II*—Negligence.

Plaintiffs' original and amended complaints contain a veritable laundry list of legal theories asserted under federal and state law whereby plaintiffs seek to recover substantial sums for losses allegedly sustained by them as a result of their purchase of new homes in the Calvert Ridge subdivision. Named as defendants are numerous corporate entities and several individuals. Plaintiffs' expansive allegations have given rise to cross-claims and third-party claims, adding to the large number of parties in this litigation.

Extensive discovery and the settlement of some of the parties' claims have resulted in the elimination of only a few of the issues and in only a slight reduction in the number of the parties who are still in-

volved. The number of suing families has now been reduced from seventeen to fourteen. The Brantly Defendants and Marshalee, although having settled with the plaintiffs, still remain in the case as a result of their cross-claims and the cross-claims brought against them by the Ryan Defendants. Only two third-party defendants remain, and the third-party claims against one of them have been severed. As a result of rulings previously made by the Court and plaintiffs' voluntary dismissals, ten counts of the amended complaint are still pending.

The contentious dispute between the parties began when, in September of 1998, methane gas was detected not in plaintiffs' homes but in homes located nearby in the Calvert Ridge subdivision. It was plaintiffs' fear that their health and their property values were or would be adversely affected by methane discovered in nearby lots which led to the commencement of this civil action. However, in the intervening years, none of the plaintiffs have suffered any physical injuries caused by the presence of methane on their properties. Although methane detectors have from time to time alarmed, most of these incidents have been false alarms. With the one exception which occurred more than two and one-half years ago in the Ratliff home, no methane has ever been detected in any one of plaintiffs' homes. There have been no explosions or fires because of the presence of methane, and two plaintiff families have been able to enter into contracts for the sale of their properties at prices higher than those originally paid. Nevertheless, a number of plaintiffs have here presented evidence indicating that they have suffered emotional damage as a result of their concern that methane may be or will be detected in their homes. Plaintiffs have also presented evidence that their property values have been adversely affected because it is now known that their homes were built on a quarry and because methane has been detected nearby.

According to the Ryan Defendants, plaintiffs are overly sensitive and have overreacted to the events which occurred in September of 1998 and later when methane detectors in their homes alarmed. Although there is evidence of record supporting this contention of the Ryan Defendants, this issue cannot be finally decided as a matter of law at this stage of the case by way of defendants' pending motion for summary judgment. As determined by the Court herein, two of the claims brought by plaintiffs against the Ryan Defendants will be presented to the jury at the trial in this case. It will be for the jury to decide, after hearing the plaintiffs' testimony and other evidence in the case, whether they have overreacted to what they perceive to be a methane problem and whether they have suffered emotional damage and sustained losses in the value of their properties because, without their knowledge, their homes were built over an abandoned quarry. On the record here, this Court has concluded that two of the counts of the amended complaint must proceed to trial while eight of them are not sustainable as a matter of law.

## III

### *Summary Judgment Principles*

It is well established that a party moving for summary judgment or partial summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment or partial summary judgment as a matter of law. *Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir.1984). The movant's burden may be met by consideration of affidavits, exhibits, depositions and other discovery materials. *Id.* The burden

is on the moving party at the summary judgment stage to show that there is an absence of evidence to support the non-moving party's position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985), when the moving party has carried its burden under Rule 56, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). " 'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick,* 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theatres, Inc.,* 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967), *cert. denied,* 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)). Moreover, only disputed issues of *material* fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Hum-phreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Catrett,* 477 U.S. at 323–24, 106 S.Ct. 2548).

## IV

### *Motion for Summary Judgment of the Ryan Defendants*

#### (a)

#### *Count I—Federal Solid Waste Law*

Count I of the amended complaint is brought pursuant to the "Citizen Suit" provision of the federal Resource, Conservation and Recovery Act ("RCRA"), which states that any person "may commence a civil action on his own behalf against any person ... who has contributed or who is contributing to the past or present handling, storage, treatment, transportation or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).[8] This provision authorizes the district court where the action is brought "to restrain any person" and/or to "order [any] person to take such other action as may be necessary." *Id.*

Plaintiffs allege that the Ryan Defendants contributed to the past handling of solid waste at the Calvert Ridge development, and they claim that the continued presence of this solid waste presents an imminent and substantial endangerment to their health and the environment. In particular, it is asserted that the organic solid waste, namely tree stumps and branches, is decomposing and generating elevated levels of methane gas which threaten to

**8.** The RCRA defines solid waste as "garbage, refuse ... and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities." § 6903(27). In this case, the rubble which was used to reclaim the quarry included discarded materials (tree stumps and branches) from commercial operations and community activities (such as the clearing of land and the construction of roads). Therefore, solid waste, as defined by the RCRA, is present at Calvert Ridge.

cause fires and explosions in plaintiffs' houses and yards. Plaintiffs are asking this Court to enter an injunction ordering the Ryan Defendants to delineate fully the nature and extent of the solid waste and then remove all solid waste that presents a substantial risk.

■ To prevail on a RCRA claim, a plaintiff must show that the "solid or hazardous waste at issue may present an imminent and substantial endangerment." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 486, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (internal quotations omitted). In *Meghrig*, the Supreme Court explained that "an endangerment can only be imminent if it threatens to occur immediately, ... and the reference to waste which may present imminent harm quite clearly excludes waste that no longer presents such a danger." *Id.* at 485–86, 116 S.Ct. 1251 (internal citations and quotations omitted). The Court favorably quoted *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir.1994), for the proposition that the language of the statute "implies that there must be a threat which is present *now*, although the impact may not be felt until later." *Id.* at 486, 116 S.Ct. 1251. (Emphasis in original).

An endangerment is a "reasonable cause for concern that someone or something may be exposed to a risk of harm ... if remedial action is not taken." *Foster v. U.S.*, 922 F.Supp. 642, 661 (D.D.C.1996). Proof of actual harm is not required. *Price*, 39 F.3d at 1019. For an endangerment to be substantial it must be "serious," and "there must be some necessity for action." *Id.*

■ Applying these principles to the facts of record here, this Court concludes that the conditions at Calvert Ridge do not present an imminent and substantial endangerment. Plaintiffs have not here presented credible evidence that an immediate and serious risk of harm now exists if remedial action is not taken.

Plaintiffs argue that a substantial threat of explosion exists because methane detectors in their homes have sounded an alarm on some 120 occasions. However, as the Ryan Defendants point out, most of these alarms were due to identifiable reasons unrelated to methane gas, including, in particular, the presence of hair spray or cleaning aerosol near the detectors. Furthermore, the record indicates that, in spite of more than 175 tests over the past two and one-half years, explosive levels of methane gas have *never* been detected in any of plaintiffs' houses. For methane gas to explode, the proper conditions must exist, including a concentration of methane gas at a minimum level of 5%. Plaintiffs have produced no evidence that methane gas has ever been present at a level of 5% inside any of their homes.

On a few occasions, explosive levels of methane gas have been detected not in plaintiffs' homes but in certain areas of plaintiffs' yards. But this evidence alone does not demonstrate a substantial risk of harm because methane gas must be in a confined space in order to explode. Plaintiffs argue that it is possible for methane gas to accumulate in underground spaces like utility vaults and dry wells. But even if methane gas possibly might accumulate in such confined spaces, plaintiffs have not produced probative evidence showing how it can be expected that a source of ignition would be introduced into these spaces. Without a spark or some other source of ignition, methane gas will not explode.

In September of 1998 when methane was first detected at Calvert Ridge, the Ryan Defendants immediately undertook significant remedial efforts in order to decrease the possibility of any risk of harm to plaintiffs. The Ryan Defendants sealed

the basement floors of plaintiffs' houses and installed passive ventilation systems in order to prevent the accumulation of methane gas. *See, e.g., Price,* 39 F.3d at 1018 (affirming the district court ruling that no imminent and substantial endangerment existed because concrete foundations under plaintiffs' houses acted as barriers against exposure to lead contamination in soil); *see also Foster,* 922 F.Supp. at 661 (finding in favor of defendants who argued that asphalt paving blocked pathway to contamination.) The Ryan Defendants also hired experts to assess any methane problem, and they excavated parts of Lot 11 where the experts believed the primary source of methane generation was located. Moreover, all local, state and federal authorities have discontinued any investigation of a possible solid waste problem existing at Calvert Ridge. Even if there had been a "reasonable cause for concern" existing in September 1998, the record here establishes that there is no longer a "serious" threat coupled with "some necessity for action." *Price,* 39 F.3d at 1019; *see also Meghrig,* 516 U.S. at 486, 116 S.Ct. 1251 (finding that "waste which may present imminent harm quite clearly excludes waste that no longer presents such a danger.").

In sum, plaintiffs have not produced "significantly probative" evidence (*Felty,* 818 F.2d at 1128) that the presence of solid waste at Calvert Ridge may present an imminent and substantial endangerment if remedial action is not taken. *Foster,* 922 F.Supp. at 661. Accordingly, the Ryan Defendants' motion for summary judgment as to Count I of the amended complaint will be granted, and plaintiffs' motion for summary judgment as to Count I will be denied.

### (b)
### Count III—Public Nuisance

■ The Maryland Court of Appeals has stated that public nuisances "are usu-ally placed in three classifications: [f]irst, those which are nuisances *per se* or by statute; second, those which prejudice public health or comfort . . .; third, those which are not nuisances, but may become so by reason of their locality, surroundings, or the manner in which they may be maintained." *Burley v. City of Annapolis,* 182 Md. 307, 312, 34 A.2d 603 (1943). More recently, the Court of Appeals defined a public nuisance as an unreasonable interference with a right that is common to all members of the general public. *Tadjer v. Montgomery County,* 300 Md. 539, 552–53, 479 A.2d 1321 (1984) (citing Restatement (2d) of Torts § 821B). Circumstances to be considered are whether the conduct is "of a continuing nature or has produced a permanent or long-lasting effect," and whether it involves a "significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience." Restatement (2d) of Torts § 821B(1)(a)(c).

As noted by the Ryan Defendants, this Court previously invited them to file a motion for summary judgment addressing the sufficiency of the evidence to support plaintiffs' public nuisance claim after there had been inquiry into the facts to clarify the application of the law. *Adams,* 193 F.R.D. at 256–57. On the record now developed here, this Court concludes that this case does not constitute the first type of public nuisance, namely a nuisance *per se,* because there is no statutory prohibition against building houses on top of a reclaimed quarry. Therefore, the Court must determine here whether the circumstances represent either the second type (an interference with public health), or the third type (protected conduct which may become a public nuisance because of the particular surroundings or the manner in which the conduct is carried out).

Based upon the evidence presented, this Court concludes that a public nuisance does not exist at Calvert Ridge under either category because the conditions at Calvert Ridge do not present an unreasonable interference with a right common to all members of the general public. *Tadjer,* 300 Md. at 552, 479 A.2d 1321 (citing Restatement (2d) of Torts § 821B). It is alleged in the amended complaint that the actions of the Ryan Defendants have adversely affected the common right of the general public "to have free access to the public roads and sidewalks through the Calvert Ridge neighborhood without the fear of an explosion from methane accumulation." ¶ 157. Evidence of record does not support these allegations, because methane will explode only if it is mixed with oxygen in a confined space and then ignited. Such circumstances do not exist near the roads and sidewalks in Calvert Ridge.

Plaintiffs contend that methane gas can travel underground and accumulate in "public" subsurface spaces, like in utility vaults and along sewer lines, and that it therefore becomes possible for methane gas to mix with oxygen and be ignited by a carelessly tossed cigarette or a spark from a passing car. These arguments are no more than mere speculation and have no evidentiary support in this record. This Court is satisfied that a public nuisance of the second type does not exist because no significant interference with public health or safety has occurred at Calvert Ridge. *See* Restatement (2d) of Torts § 821B(1)(a); *Burley,* 182 Md. at 312, 34 A.2d 603. Furthermore, since there is no indication that the so-called methane "problem" will worsen, this Court will also reject plaintiffs' argument that the conditions at Calvert Ridge may become a public nuisance in the future. As noted, any potential threat to public health has been mitigated by the removal of what experts have believed to be the primary source of methane-generating material. Since the facts of record in this case do not support any of the three types of public nuisance claims recognized by Maryland law, the Ryan Defendants' motion for summary judgment will also be granted as to Count III.

(c)

### Counts V and VI—Fraud and Concealment

■ To recover under a claim of fraud in Maryland, a plaintiff must prove: (1) that the defendant made a false representation to the plaintiff, (2) that the falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. *Abt Associates, Inc. v. JHPIEGO Corp.,* 104 F.Supp.2d 523, 536 (D.Md.2000) (*citing Nails v. S & R,* 334 Md. 398, 415, 639 A.2d 660 (1994)). A plaintiff has the burden of establishing each of these elements by clear and convincing evidence. *Abt,* 104 F.Supp.2d at 536 (*citing Everett v. BGE,* 307 Md. 286, 300, 513 A.2d 882 (1986)). In particular, Maryland courts have demanded proof of both the defendant's intent to defraud and the defendant's knowledge of the falsity of the statement at the time it was made. *See Paramount Brokers, Inc. v. Digital River, Inc.,* 126 F.Supp.2d 939, 950–51 (D.Md.2000) (citing *Miller v. Fairchild Industries, Inc.,* 97 Md.App. 324, 343–44, 629 A.2d 1293 (1993)).

Applying these principles here, this Court concludes that plaintiffs' claim of fraud asserted in Count V must fail. Plaintiffs allege that the Ryan Defendants made general misrepresentations relating

to the suitability and value of the lots and the high quality of the Ryan Defendants' homes. Nine plaintiff families additionally claim that false comments were made regarding the prior use of the Calvert Ridge property as a farm or a horse farm.

■ The facts of record here do not indicate that the Ryan Defendants' broad statements about its reputation and workmanship were purposely made to defraud plaintiffs. Moreover, such common marketing statements are not actionable as fraudulent misrepresentations under Maryland law. "[R]epresentations as to the soundness and value of the house are normally considered in law to be indefinite generalities of exaggeration which could deceive no rational person and therefore do not amount to misrepresentation." *Wolin v. Zenith Homes, Inc.*, 219 Md. 242, 247, 146 A.2d 197 (1959); *see also Appel v. Hupfield*, 198 Md. 374, 380–81, 84 A.2d 94 (1951); *Milkton v. French*, 159 Md. 126, 129–30, 150 A. 28 (1930).

■ This Court further finds plaintiffs' arguments concerning the "farm" and "horse farm" statements to be unconvincing, because nothing in the record demonstrates that such statements were made with the requisite intent to defraud. These comments were made in passing to only nine of the fourteen Ryan Families. If the Ryan Defendants' true purpose was to defraud plaintiffs, all of their sales representative would no doubt have expressly informed all plaintiffs that the Calvert Ridge property had been previously used as something other than a quarry. No representations of this sort were made here.

As stated by the Court of Appeals of Maryland, "when fraud or dishonesty is imputed, 'something more than a mere preponderance of the evidence must be produced, the proof must be clear and satisfactory and be of such character as to appeal strongly to the conscience of the court.' " *Everett*, 307 Md. at 301, 513 A.2d 882 (quoting *First Nat'l Bank v. U.S.F. & G. Co.*, 275 Md. 400, 340 A.2d 275 (1975)). The record does not contain clear and convincing evidence to support plaintiffs' claims of fraud. This Court will therefore also grant summary judgment in favor of the Ryan Defendants as to Count V. .

■ In Count VI of the amended complaint, it is alleged that the Ryan Defendants intentionally concealed the existence of the reclaimed quarry in an effort to mislead plaintiffs. Like their claim of fraud, plaintiffs must demonstrate that the Ryan Defendants deliberately meant to deceive them. As the Fourth Circuit recently stated "concealment . . . involves the requisite intent to mislead by creating a false impression or representation, and which is sufficient to constitute fraud even without a duty to speak." *United States v. Colton*, 231 F.3d 890, 899 (4th Cir.2000). Concealment is "characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter," and "simple 'good faith' imposes an obligation not to purposely conceal material facts with an intent to deceive." *Id.* at 899–900. The Court of Appeals of Maryland has similarly defined concealment as "the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with the intent to deceive." *Fegeas v. Sherrill*, 218 Md. 472, 477, 147 A.2d 223 (1958); *see also Lubore v. RPM Associates, Inc.*, 109 Md.App. 312, 329, 674 A.2d 547 (1996), *cert. denied*, 343 Md. 565, 683 A.2d 177 (stating that "the tort of deceit— also called concealment or non-disclosure—consists of . . . inten[tion] to defraud or deceive.")

On the record here, plaintiffs' claim of concealment must also fail because there are insufficient facts of record to support plaintiffs' contention that the Ryan Defendants knowingly withheld material information with the intent to deceive plaintiffs. Before they purchased the lots in question from the Brantly Defendants, the Ryan Defendants were informed that both a September 1995 Phase I Environmental Site Assessment and a July 1996 supplement to that assessment indicated that the Calvert Ridge property did not contain any hazardous wastes or other contaminants.

Moreover, eight of the fourteen houses of the plaintiffs are located in an area which was never a part of the quarry. Although five other houses are located within the former perimeter of the quarry, all of the uncontrolled fill underneath and around each building pad was removed and replaced with clean, compacted, structural fill before these five house were built. Only the house on Lot 8 is located above uncontrolled fill. However, before this house was constructed, the Ryan Defendants were given an engineering certification verifying that Geogrid reinforcements were placed underneath the building pad and over the uncontrolled fill. Reinforcements of this nature constitute an acceptable method of supporting the foundation of a residential home.

For these reasons, this Court concludes that there is insufficient evidence of record to indicate that the Ryan Defendants engaged in "deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter." *Colton,* 231 F.3d at 899. Accordingly, the Ryan Defendants' motion for summary judgment will also be granted as to Count VI.

(d)

## VIII Consumer Protection Act Unfair or Deceptive Trade Practices

■ Count VIII of the amended complaint alleges that plaintiffs have been injured because the Ryan Defendants' violated the Maryland Consumer Protection Act ("CPA"), Md.Code Ann., Com. Law II § 13–101 *et seq.,* by making false or misleading statements that had the tendency to deceive plaintiffs regarding the quality of the homes sites that were being offered for sale. It is also asserted that the Ryan Defendants violated the CPA by failing to disclose material facts about the condition of the Calvert Ridge subdivision. The CPA is intended to "set certain minimum statewide standards for the protection of consumers across the State ...." § 13–102(b)(1). The provisions of the CPA "shall be construed and applied liberally to promote its purpose." § 13–105; *see also State of Maryland v. Cottman Transmissions Sys., Inc.,* 86 Md.App. 714, 743, 587 A.2d 1190 (1991).

The CPA prohibits a person from engaging in any "unfair or deceptive trade practice" with respect to the sale, or offer for sale, of any consumer goods, services, or realty. *See* § 13–303. Section 13–301 defines the term "unfair or deceptive trade practice" to include, *inter alia,* any:

(1) False ... or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) Representation that:

(i) ... consumer realty ... [has] a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which [it] do[es] not have;

\* \* \* \* \* \*

(iv) ... consumer realty ... [is] of a particular standard, quality, grade, style, or model which [it] [is] not;

(3) Failure to state a material fact if the failure deceives or tends to deceive;

\* \* \* \* \* \*

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of ... consumer realty;

Pursuant to § 13–408, any person may bring a private cause of action to recover damages, including attorney's fees, which result from a practice prohibited by the CPA.

The Court of Appeals of Maryland has determined that proof of scienter is required to establish a violation of § 13–301(9) of the CPA. *See Luskin's, Inc. v. Consumer Protection Div.*, 353 Md. 335, 366–67, 726 A.2d 702 (1999); *see also Forrest v. P & L Real Estate Investment Co.*, 134 Md.App. 371, 396 n. 4, 759 A.2d 1187 (2000). Therefore, to prevail under § 13–301(9), plaintiffs must produce evidence that the Ryan Defendants' knowingly engaged in "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that [plaintiffs] rel[ied] on the same in connection with" the sale of houses at Calvert Ridge. In Part IV(c) of this Opinion, the Court discussed plaintiffs' claims of fraud and concealment alleged in Counts V and VI, and determined as a matter of law that the record here does not support a finding that the Ryan Defendants' intended to deceive plaintiffs by purposely misrepresenting or omitting material facts. Accordingly, plaintiffs cannot recover un-der Count VIII for a violation of § 13–301(9) of the CPA because there is insufficient evidence that the Ryan Defendants' acted with the requisite scienter.

When compared with § 13–301(9), the requirements of §§ 13–301(1), (2), and (3) are much more complex. In *Golt v. Phillips*, 308 Md. 1, 11, 517 A.2d 328 (1986), the Court of Appeals of Maryland indicated that these three subsections "do[ ] not require scienter ... the subsections require only a false or deceptive statement that has the capacity to mislead the consumer tenant." This statement was made in the context of a case in which a landlord advertised and rented an unlicensed apartment in violation of a Baltimore City Code licensing requirement which the Court considered "an integral part of the City's efforts to maintain safe residential conditions for its citizens." *Id.* at 13, 517 A.2d 328. The Court concluded that a "landlord must be held to be aware of all laws concerning the validity of leasing its premises," and "[i]gnorance of the law ... is no defense." *Id.* at 10, 517 A.2d 328. In *Hayes v. Hambruch*, 841 F.Supp. 706, 713 (D.Md.1994), *aff'd*, 64 F.3d 657 (4th Cir. 1995) (unpublished), this Court characterized the *Golt* opinion as "imput[ing] knowledge to the landlord of the fact that the premises were unlicensed," which resulted in a "determination that the 'omission' concerning the licensing of the premises amounted to an affirmative misrepresentation."

In *Hayes*, the allegedly unfair trade practice was the defendant landlord's implied representation that the premises were in compliance with the Baltimore City Code, when in fact this representation was false because the premises violated the Code due to the presence of flaking, loose and peeling paint. *Id.* at 712–13. This Court concluded that "a landlord may not be held liable under the CPA for a

failure to state a material fact concerning a defect in the rented premises, unless the landlord knows or has reason to know of the defect." *Id.* at 714. On appeal, the Fourth Circuit upheld this Court's decision and clarified that *Hayes* "differs somewhat from *Golt,* because [defendant] claims that she was unaware of the existence of a factual matter, not of the law." *Hayes v. Hambruch,* No. 94–1271, 1995 WL 479892, at *4 (4th Cir. Aug.15, 1995). Therefore, the *Hayes* and *Golt* decisions indicate that, under §§ 13–301(1), (2) and (3) of the CPA, while evidence of scienter is required to prove allegedly unfair trade practices which involve the misrepresentation or omission of facts, evidence of scienter is not required to prove allegedly unfair trade practices which involve legal issues, because knowledge of the law is implied.

In *Benik v. Hatcher,* 358 Md. 507, 510–511, 750 A.2d 10 (2000), the Court of Appeals of Maryland recently revisited the issue of whether "proof of scienter is a prerequisite to holding a landlord liable" under §§ 13–301(1), (2) and (3) of the CPA. After a lengthy analysis of the relevant case law, including the opinions in *Golt, Hayes, Richwind Joint Venture 4 v.' Brunson,* 335 Md. 661, 645 A.2d 1147 (1994) and *Scroggins v. Dahne,* 335 Md. 688, 645 A.2d 1160 (1994), the Court concluded that to prove a violation of these subsections "the landlord must have knowledge, constructive or actual, of the condition of the premises *at the time of the lease." Benik,* 358 Md. at 531, 750 A.2d 10 (emphasis added).

A landlord's constructive knowledge is deemed to encompass "the requirements of the City Code pertaining to the habitability of the leased premises," *id.* at 532, 750 A.2d 10, including knowledge that the Code is violated if there is present "chipping and flaking paint in the apartment at the inception of the lease." *Id.* at 534, 750 A.2d 10. In addition, the Court of Appeals

found that "the law presumes the existence of a condition that a reasonable inspection would have uncovered ... because of the implied representation[s] that accompan[y] the making of the lease," such as "the representation that the rental is lawful, and that the apartment is in good repair, in safe condition and fit for human habitation ...." *Id.* at 533–34, 750 A.2d 10 (internal citation omitted).

The *Benik* Court pointed out that the Baltimore City Housing Code makes it illegal to rent a dwelling unit containing Housing Code violations, and the presence of flaking, loose or peeling paint is a violation of the Housing Code requirement that an apartment be in good repair and safe condition. Therefore, it was determined that the rental of an apartment containing flaking, loose or peeling paint was illegal under the Housing Code and constituted a violation of §§ 13–301(1), (2), and (3) of the CPA. In other words, such conduct would be unfair and deceptive because it would have a tendency to mislead a tenant as to the lawfulness of the rental and the habability of the premises. *Id.* at 535, 750 A.2d 10.

There are two important limitations with respect to the *Benik* Court's analysis of scienter. First, knowledge of a fact, as opposed to knowledge of a law, should be imputed to a landlord only if the existence of that·fact will affect the landlord's legal obligations to the tenant. For instance, a landlord is not deemed to have constructive knowledge of whether old paint in an apartment contains lead because such knowledge has no effect upon a landlord's legal obligation under the Housing Code to ensure that the premises are free from flaking, loose or peeling paint. *See Richwind* 335 Md. at 686, 645 A.2d 1147 ("Renting a premises with intact lead-based paint is not in itself a violation of the CPA.") The law imputes knowledge of

flaking, loose or peeling paint because that is a "defective condition," *Benik* 358 Md. at 536, 750 A.2d 10, which violates a landlord's legal obligation to provide an apartment which does not "endanger the life, health or safety of . . . tenants." *Forrest,* 134 Md.App. at 394, 759 A.2d 1187; *see also Benik,* 358 Md. at 536, 750 A.2d 10 (finding that "in Baltimore City, the rental of an apartment with flaking, loose and peeling paint is like renting an apartment in an apartment building without a license for the operation of that building; both are violations of the Housing Code.")

The second limitation in the *Benik* opinion relating to scienter is that a landlord's liability under the CPA is limited to "the condition of the premises at the time of the lease." *Id.* at 531, 750 A.2d 10; *see also Richwind,* 335 Md. at 683, 645 A.2d 1147 ("The CPA applies to a lease at the time the consumer enters into it, and the Act is intended to govern deceptive trade practices which induce the prospective tenant to enter into such a lease.") Therefore, a landlord is presumed to have knowledge only of legally relevant facts regarding the condition of the premises "at the inception of the lease," *Benik* 358 Md. at 531, 750 A.2d 10, because the CPA was not intended to "impose a standard amounting to strict liability for any defect arising on the premises during the term of the lease." *Richwind,* 335 Md. at 684, 645 A.2d 1147. In sum, "if the chipping or peeling paint [does] not exist at the time the lease [is] entered into, the landlord [cannot] be said to have engaged in a deceptive trade practice under the CPA." *Scroggins,* 335 Md. at 696, 645 A.2d 1160.

Applying these principles of law to the facts of record here, this Court concludes

that the Ryan Defendants' failure to disclose the existence of the reclaimed quarry at the time that plaintiffs purchased their houses is not a material omission which had the tendency to deceive or mislead plaintiffs in violation of §§ 13–301(1), (2), and (3) of the CPA. First, this Court rejects plaintiffs' argument that the Ryan Defendants had constructive knowledge that the organic rubble within the reclaimed quarry would generate dangerous levels of methane gas. For purposes of the CPA, the Ryan Defendants can be presumed to have had knowledge only of conditions at Calvert Ridge at the time that plaintiffs purchased their houses. *See Benik,* 358 Md. at 531, 750 A.2d 10; *Richwind,* 335 Md. at 684, 645 A.2d 1147; *Scroggins,* 335 Md. at 696, 645 A.2d 1160. It is not disputed here that the Ryan Defendants had no knowledge that the reclaimed quarry was generating methane when the houses were sold. Knowledge of the possibility that methane could be generated is not a matter of law like the unlicensed status of the apartment in *Golt.* Such knowledge therefore cannot under the circumstances here be imputed to the Ryan Defendants. Even though the methane-generating potential of the reclaimed quarry is a factual issue, it has no effect upon the Ryan Defendant's legal obligations to plaintiffs.[9] Therefore, the situation here is unlike *Benik,* where the existence of flaking paint was found to be a fact the existence of which could be imputed to a landlord because to "hold otherwise would be to encourage landlords not to take seriously the obligations imposed upon them by the City Code . . . ." *Id.* at 534, 750 A.2d 10. Knowledge of the presence of a reclaimed quarry which might eventually generate methane did not im-

9. As of January 1, 2000, the Maryland Real Property Article was amended to require builders to either disclose the presence of methane, *inter alia,* or state that no represen-

tations are being made with respect to the presence of methane. *See* Md.Code Ann., Real Prop. § 10–603(a)(1)(iii). That statute is not applicable to the circumstances here.

pose any legal obligations upon the Ryan Defendants, and such knowledge accordingly cannot be imputed to the them.

Plaintiffs' second argument is not based on the contention that the Ryan Defendants had constructive knowledge that methane gas could become a problem at Calvert Ridge. Rather, plaintiffs claim that the Ryan Defendants engaged in an unfair trade practice by virtue of their "failure to state" their actual knowledge of the existence of the reclaimed quarry, which is a "material fact," and they claim that this "failure deceive[ed] or tend[ed] to deceive" them. § 13–301(3). Plaintiffs' principal contention is that materiality must be viewed from the purchaser's perspective, and that the existence of the reclaimed quarry is a material fact merely because all the plaintiffs have declared that they would not have bought houses at Calvert Ridge if they had been informed of the existence of the reclaimed quarry. On the record here, this Court concludes that this argument of plaintiffs must fail.

This Court and many others have consistently held that a "statement or omission is considered 'material' under the CPA if 'a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action.'" *Hayes*, 841 F.Supp. at 713 (quoting *Golt*, 308 Md. at 10, 517 A.2d 328). This issue may be a question of fact for the jury, but "if the facts do not allow for a reasonable inference of materiality or immateriality," then the issue should be decided as a matter of law. *Green v. H & R Block*, 355 Md. 488, 524, 735 A.2d 1039 (1999).

For purposes of the CPA, the presence of the reclaimed quarry at Calvert Ridge is analogous to the presence of intact, lead-based paint in the plaintiffs' apartment in *Scroggins*. In both situations, the condition in question is not immediately danger-

ous, and it is not prohibited by any statute or ordinance. Following the reasoning in *Scroggins*, 335 Md. at 696, 645 A.2d 1160, this Court concludes that the Ryan Defendants' failure to disclose the presence of the reclaimed quarry is not a deceptive trade practice under the CPA. *See Sternberger v. Kettler Bros.*, 123 Md.App. 303, 310, 718 A.2d 619 (1998) (holding that a builder was not liable under the CPA for selling townhouses without informing purchasers that roofing materials had been treated with special fire retardant chemicals, even though some formulations of these chemicals were later found to cause premature degradation of the roofing materials).

Moreover, under § 13–301(3), materiality alone is not sufficient to impose liability. *See, e.g., Forrest*, 134 Md.App. at 395, 759 A.2d 1187. According to the CPA, an unfair trade practice under § 13–301(3) is expressly defined to include both the element of materiality and the element of deception. *See also Id.* at 396, 759 A.2d 1187 ("If the tenant is deceived and the hazardous condition causes damages, liability is established.") Unlike the defendants in *Golt, Benik* and other cases cited by plaintiffs, the Ryan Defendants took affirmative steps to avoid the possibility that their failure to disclose the existence of the reclaimed quarry would have a tendency to deceive plaintiffs. In particular, the Ryan Defendants conducted a reasonable inspection of the plaintiffs' new home sites, including discussions with John Liparini, the previous owner of the property, and a review of Eco Dynamic's Phase I Environmental Site Assessment. Defendants' investigation confirmed the absence of any housing or building code violations. This Court accordingly concludes that plaintiffs have failed to present evidence indicating that the Ryan Defendants committed a

deceptive trade practice as defined in § 13–301(3) of the CPA.

■ Lastly, plaintiffs argue that the Ryan Defendants made some affirmative misrepresentations in violation of § 13–301(1) and (2) of the CPA. Specifically, it is claimed that the Ryan Defendants' comments regarding the prior use of the Calvert Ridge property as a farm or horse farm had the "capacity, tendency, or effect of deceiving or misleading" plaintiffs. *See* § 13–301(1). It is further asserted that the Ryan Defendants made other representations regarding the "characteristics" and "quality" of the plaintiffs' homes sites which the sites "[did] not have." *See* § 13–301(2)(i), (iv).

Plaintiffs' arguments must be rejected because, as discussed hereinabove, the record here contains insufficient evidence of deception on the part of the Ryan Defendants. Furthermore, the record does not indicate that any of the Ryan Defendants' general statements about the beneficial aspects of the Calvert Ridge subdivision were actually false at the time that such statements were made.

Plaintiffs' reliance upon *Mercedes–Benz of North Am., Inc. v. Garten,* 94 Md.App. 547, 564, 618 A.2d 233 (1993), is misplaced. That case involved a blatantly false representation in which an automobile salesman informed a buyer that a 1990 model was "identical" to a 1986 model, except for cosmetic changes. In fact, the 1990 model was not identical inasmuch as it contained an emissions control device which occasionally caused a delay in shifting the vehicle from second to third gear. Here, the farm and horse farm statements were not misrepresentations which would have a tendency to deceive in light of the fact that the Calvert Ridge property had previously been used as a farm, and in light of the fact that, at the time that plaintiffs purchased their homes, an actual horse farm was clearly visible on property immediately adjacent to Calvert Ridge. Similarly, the Ryan Defendants' broad statements concerning the safety and suitability of Calvert Ridge are far from being flatly incorrect as was the statement by the defendant in the *Mercedes–Benz* case.

In sum, this Court concludes that the Ryan Defendants did not engage in any unfair or deceptive trade practices as that term is defined in the CPA. Accordingly, the Ryan Defendants' motion for summary judgment will be granted as to Count VIII, and the plaintiffs' motion for summary judgment as to that Count will be denied.

(e)

### Counts IX and XI—Breach of Contract and Breach of Express Warranties

Count IX of the amended complaint asserts two different claims of breach of contract. First, it is alleged that the Ryan Defendants' "new home warranty security plan does not satisfy the requirements of Section 10–606(a) of the Real Property Article, and this act and other acts and omissions constitute a material breach of contract under Section 10–604(c)(i–ii) [sic] of the Real Property Article." ¶ 246. Second, Count IX asserts in general that the Ryan Defendants materially breached their contracts with plaintiffs by failing to provide them with "safe homes and ... home sites free from contamination and serious risk of physical injury." ¶ 247.

Section 10–604(c) of the Maryland Real Property Article sets forth the circumstances under which a breach of contract action may be brought pursuant to a new home warranty security plan, as follows:

(1) If the purchase or construction contract provides that the new home shall be covered by a new home warranty under a new home warranty security plan it shall constitute a material breach of the contract if either:

(i) The builder was not a participant in good standing on the date of the contract with a new home warranty security plan that satisfies the requirements of § 10–606(a) of this subtitle; or

(ii) The new home has not been registered in the plan on or before the warranty date.

Plaintiffs do not contend that § 10–604(c)(1)(ii) was violated. However, they do claim that § 10–604(c)(1)(i) was violated by the Ryan Defendants' new home warranty security plan because it failed to comply with § 10–606(a)(7), which states "[a] new home warranty security plan shall ... [m]eet any other requirements determined by the Secretary and be approved by the Secretary." In particular, plaintiffs argue that the Ryan Defendants' plan neither has the approval of the Secretary of Labor, Licensing, and Regulation ("Secretary") nor follows the Secretary's implementing regulations regarding mandatory disclosures by the builder and written acknowledgment from the buyer. *See e.g.,* § 10–605; COMAR 09.01.09.02. This Court must disagree.

Included in the record here is a December 17, 1990 letter from the Maryland Department of Licensing and Regulation to the Ryan Defendants. According to this letter, "[t]he Secretary of Licensing and Regulation has approved the New Home Warranty Security Plan submitted by you upon the following conditions ... In the event of any conflict between your Plan and the provisions of the Maryland Real Property Article ..., the Real Property Article shall prevail." This statement clearly establishes that the Ryan Defendants' new home warranty security plan was approved by the Secretary as mandated by § 10–606(a)(7). Also, contrary to plaintiffs' assertions, the existence of a conflict between the language of the Ryan Defendants' plan and the provisions of the Real Property Article does not preclude, suspend or revoke the Secretary's express approval of the plan. In fact, subsections (i) and (ii) of § 10–606(b)(1) of the Real Property Article set forth the only two circumstances whereby the Secretary may revoke or suspend approval of a new home warranty security plan, and neither of these subsections concerns a conflict in language.

Plaintiffs' contention that the Ryan Defendants did not make proper disclosures to them and failed to secure written acknowledgment from them is not persuasive. Indeed, the record here indicates otherwise. Six of the fourteen plaintiff families executed a "New Home Disclosure Addendum" and a "New Home Warranty Notice" containing precisely the same language required by COMAR 09.01.09.02 and § 10–605, respectively,[10] while the other eight plaintiff families received and/or signed documents which included substantially similar language.[11] For instance, instead of a "New Home Warranty Notice," six of these eight plaintiff families in the latter group signed a "General Addendum to Purchase Agreement" containing a "Warranty" provision with language almost identical to that found in § 10–605.[12]

---

10. These plaintiffs are the Banfer, Batzer, Burdette, McGuigan, Montieth and Ratliff families.

11. These plaintiffs are the Adams, Angeletti, Eakin, Hess, Johnson, Lee, Muller and Rowe families.

12. Although the Muller and Rowe families each signed a "General Addendum to Purchase Agreement," the copies of these two addenda submitted by the Ryan Defendants do not actually include the same "Warranty" provision as the other addenda. Nevertheless, the Mullers and the Rowes each executed a purchase agreement and received a home-

In addition, each of these eight plaintiff families received a "Ryan Homes Homeowner's Manual" which included a "Homeowner Limited Warranty" section making virtually the same disclosures as those set forth in COMAR 09.01.09.02. This Court will therefore deny plaintiffs' claim of breach of contract asserted under § 10–604(c)(1)(i) because the Ryan Defendants' new home warranty security plan was approved by the Secretary and because it met all of the requirements of the Secretary in full satisfaction of § 10–606(a)(7).

■ Count IX of the amended complaint also asserts a breach of contract claim based upon the Ryan Defendants' alleged failure to provide safe homes on safe home sites. However, neither Count IX nor plaintiffs' memorandum of law in opposition to the Defendants' motion for summary judgment mentions any contract provision which was allegedly breached. Instead, plaintiffs argue that the essence of their claim is that the Ryan Defendants breached their implied contractual duty of good faith and fair dealing by deliberately failing to disclose material facts relating to the prior use of the Calvert Ridge site. In support of their argument, plaintiffs rely on *Quality Automotive Co. v. Signet Bank/Maryland*, 775 F.Supp. 849, 852 (D.Md.1991).

However, since the *Quality Automotive* decision in 1991, this Court has repeatedly held that Maryland does not recognize a separate cause of action for breach of the implied contractual duty of good faith and fair dealing. *See, e.g., Howard Oaks, Inc. v. Maryland Nat'l Bank*, 810 F.Supp. 674, 677 (D.Md.1993) ("[T]he undersigned disagrees with the decision ... in *Quality Automotive*, which recognized a Maryland tort cause of action for breach of the duty

of good faith in commercial dealings ...."); *see also Paramount Brokers, Inc. v. Digital River, Inc.*, 126 F.Supp.2d 939, 949–50 (D.Md.2000); *Abt*, 104 F.Supp.2d at 534; *Baker v. Sun Co. Inc.*, 985 F.Supp. 609, 610 (D.Md.1997). Based on these decisions, this Court will reject plaintiffs' claim that Defendants breached their contractual covenant of good faith and fair dealing. As this Court held in *Abt*, a plaintiff seeking a recovery for breach of contract may not in Maryland assert a separate claim for breach of the covenant of good faith and fair dealing implied in that contract. 104 F.Supp.2d at 534.

Whether characterized as a violation of the Maryland Real Property Article or as a breach of the duty of good faith and fair dealing, plaintiffs' claim of breach of contract asserted in Count IX must fail. For these reasons, the Ryan Defendants are entitled to the entry of summary judgment in their favor as to Count IX, while plaintiffs' motion for partial summary judgment as to this Count will be denied.

■ In Count XI of the amended complaint, it is asserted that each of the Ryan Families were provided with a "Ryan Homes Homeowner's Manual" which contained the following express warranty:

> [The Ryan Defendants] warrant[ ] that the home will be free from major structural defects, materials or workmanship of the original construction which appeared at any time within ten years after the settlement date, and which significantly affect the load-bearing functions of the home or otherwise render it unsuitable for residential purposes.

¶¶ 282–83.

Plaintiffs claim that the Ryan Defendants have breached this express warranty

---

owner's manual, both of which contain language which coveys the substance of the no-

tice information required by § 10–605.

because their homes were built on "waste, contamination, uncontrolled fill, and unstable ground" and "suffer from major structural defects, or defects in materials and workmanship of the original construction." ¶ 284. These defects are alleged to have "significantly affect[ed] the load-bearing functions of the homes" and have resulted in "damage due to subsidence, expansion, or lateral movement of soil or waste that has been located or relocated by the builder." [13] ¶¶ 285, 287.

Contrary to plaintiffs' allegations, the facts of record here indicate that thirteen of the fourteen homes of plaintiffs at issue here were not built on uncontrolled fill or unstable ground. Although the house on Lot 8 is located on uncontrolled fill, a Geogrid reinforcement bridge was constructed over the uncontrolled fill before the house was built. Plaintiffs' own engineering expert, Raymond DeStephen, has presented no evidence indicating that the ground underneath any of plaintiffs' homes has subsided or moved in any manner. Moreover, plaintiffs have pointed to no facts in the record demonstrating that their homes contain any structural defects which would affect load-bearing capacity, and nothing in the record here indicates that plaintiffs' homes have been damaged because of ground settlement.

Inasmuch as there is no evidence of record on which a jury might rely in finding a breach of express warranty by the Ryan Defendants, their motion for summary judgment will be granted as to Count XI.

(f)

*Count X—Breach of Implied Warranties*

■ Maryland law implies the existence of certain implied warranties in con-

junction with the sale of new houses. Specifically, § 10–203 of the Maryland Real Property Article states in pertinent part:

(a) Except as provided in subsection (b) or unless excluded or modified pursuant to subsection (d), in every sale, warranties are implied that, at the time of delivery of the deed to a completed improvement [14] or at the time of completion of an improvement not completed when the deed is delivered, the improvement is:

(1) Free from faulty materials;

(2) Constructed according to sound engineering standards;

(3) Constructed in a workmanlike manner; and

(4) Fit for habitation.

(b) the warranties of subsection (a) do not apply to any condition that an inspection of the premises would reveal to a reasonably diligent purchaser at the time the contract is signed.

(c) If the purchaser, expressly or by implication, makes known to the vendor the particular purpose for which the improvement is required, and it appears that the purchaser relies on the vendor's skill and judgment, there is an implied warranty that the improvement is reasonably fit for the purpose.

(d) ... However ... an implied warranty may be excluded or modified wholly or partially by a written instrument, signed by the purchaser, setting forth in detail the warranty to be excluded or modified, the consent of the purchaser to exclusion or modification, and the terms of the new agreement with respect to it.

---

**13.** Section 10–601(*o*)(2) of the Maryland Real Property Article defines "structural defect" to include "damage due to subsidence, expansion, or lateral movement of the soil that has been located or relocated by the builder."

**14.** Section 10–201(b) defines improvement to include "every newly constructed private dwelling unit."

In Count X of the amended complaint it is alleged that plaintiffs' houses do not comply with any of the four implied warranties set forth in §§ 10–203(a)(1)–(4) because of the existence of the reclaimed quarry in their neighborhood and the presence of methane gas in their houses. It is also asserted that plaintiffs have breached the implied warranty established by § 10–203(c), because their homes are not "reasonably fit for the purpose of providing a safe and stress-free domicile" as allegedly communicated by the Ryan Defendants.[15] Since plaintiffs have presented no evidence of a breach of any of the implied warranties set forth in §§ 10–203(a)(1)–(3), this Court will address only the issue of fitness for habitation under § 10–203(a)(4).

Plaintiffs contend that the threat of methane is a constant source of stress to them, rendering their homes uninhabitable in violation of § 10–203(a)(4). In response, the Ryan Defendants assert that on most occasions when the alarms have sounded, it was because of identifiable reasons unrelated to methane gas, including the presence of hair spray or cleaning products near the detectors. As noted by the Ryan Defendants, the Howard County Fire Department has never detected methane in any of plaintiffs' houses after an alarm has sounded.

Under appropriate circumstances, the issue of habitability under § 10–203(a)(4), can be determined by the Court as a matter of law. *Loch Hill Constr. Co., Inc. v. Fricke,* 284 Md. 708, 715–16, 399 A.2d 883

(1979). In determining whether a dwelling is fit for habitation, applicable regulations or building code requirements act both as a guide in determining the issue of habitability and also as an aid in ascertaining what is necessary to make the home "fit for habitation." *Id.* at n. 6.

Here, no Howard County building code provision addresses the issue of methane. The Ryan Defendants complied with all applicable building codes in the construction of plaintiffs' homes. Valid building permits were issued for the construction of each home. Two of the homes have recently been sold. Assuredly, the plaintiffs occupying those homes can hardly claim that they were uninhabitable at the time of these sales. Nor is there proof that the homes which have now been occupied by the other families for several years are not fit for habitation. All the other families have continuously inhabited their homes from the date when they first moved in until the present time.

Based on these facts, this Court concludes as a matter of law that plaintiffs' homes were fit for habitation. The minor inconveniences resulting from the methane detectors do not rise to the level of making plaintiffs' homes unfit for habitation pursuant to § 10–203(a)(4). Accordingly, defendants' motion for summary judgment will be granted as to Count IX, and plaintiffs' motion for partial summary judgment as to Count IX will be denied.[16]

15. This claim will not be discussed separately since it is substantially similar to the allegation that plaintiffs' homes are not "fit for habitation" as required by the implied warranty specified in § 10–203(a)(4).

16. Since the Court has concluded that plaintiffs' homes are currently fit for habitation, it is not necessary to consider other arguments advanced by the Ryan Defendants. Accordingly, the Court will not address Defendants'

contention that Count IX should be dismissed because the implied warranty of habitability expired before the warranty was ever breached nor their argument that the implied warranty of habitability provided by § 10–203(a)(4) did not apply to plaintiffs' homes because each plaintiff family signed a valid disclaimer of all the implied warranties as permitted by § 10–203(d).

### (g)
### Count VII and XII—Negligent Misrepresentation and Negligence

■ Under Maryland law, negligence is doing something that a person using ordinary care would not do or not doing something that a person using ordinary care would do. MPJI § 19:1. Ordinary care means that caution, attention or skill a reasonable person would use under similar circumstances. *Id.* Negligence is a relative term and must be decided upon the facts of each particular case. *Fowler v. Smith,* 240 Md. 240, 246, 213 A.2d 549 (1965). As the Court of Appeals in *Fowler* stated in an oft-quoted passage:

> Ordinary [negligence] is a question of fact to be determined by the jury, and before it can be determined as a matter of law that one has not been guilty of negligence, the truth of all the credible evidence tending to sustain the claim of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending to establish negligence drawn... *And Maryland has gone almost as far as any jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury. The rule has been stated as requiring submission if there be any evidence, however slight, legally sufficient as tending to prove negligence, and the weight and value of such evidence will be left to the jury.* (Emphasis supplied).

*Id.; see also Giant Food v. Scherry,* 51 Md.App. 586, 592, 444 A.2d 483 (1982).

In Count VII of the amended complaint, it is alleged that the Ryan Defendants negligently provided information to plaintiffs regarding the presence of the reclaimed quarry, the safety and suitability of the subdivision, and the hazards present at the site. Plaintiffs assert that the Ryan Defendants intended them to rely on these statements and omissions in an effort to induce plaintiffs to purchase houses at Calvert Ridge. It is asserted that plaintiffs were justified in their reliance on this information, and that this reliance proximately caused them to suffer injury.

■ In *Griesi v. Atlantic General,* 360 Md. 1, 11, 756 A.2d 548 (2000), the Maryland Court of Appeals reiterated that the tort of negligent misrepresentation is actionable where it is shown that:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
>
> (2) the defendant intends that his statement will be acted upon by the plaintiff;
>
> (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;
>
> (4) the plaintiff, justifiably, takes action in reliance on the statement; and
>
> (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

The existence of a duty of care, is highly dependent upon the facts of a given case. A tort duty has in general been defined as "an expression of the sum total of those considerations of policy which lead the law to say that plaintiff is entitled to protection." *Jacques v. First Nat'l Bank,* 307 Md. 527, 533, 515 A.2d 756 (1986). Two important and related elements of a tort duty are the type of harm likely to result from a breach of the duty, and the nature of the relationship between the parties. If the failure to exercise reasonable care creates a risk of only pecuniary loss, then tort liability is conditioned upon an "intimate nexus between the parties," whereas, if the risk created is one of personal injury, then no such relationship is necessary because

the issue of foreseeability becomes paramount. *Id.* at 534–35; 515 A.2d 756.

Under the first requirement for proof of a claim of negligent misrepresentation, it must be shown that the defendant carelessly made a false statement. The defendant's conduct must fall "below the standard of care the maker of the statement owes to the person to whom it is made," and the false statement itself must be of a material fact. *Gross v. Sussex,* 332 Md. 247, 259–60, 630 A.2d 1156 (1993). In addition, if a party has an obligation to speak and fails to do so, such conduct may constitute an implied representation under appropriate circumstances, thereby providing a basis for a claim of negligent misrepresentation. *Leonard v. Sav–A–Stop Servs., Inc.,* 289 Md. 204, 213, 424 A.2d 336 (1981). A party can also be held liable on the basis of "affirmatively representing only a fragment of the entire picture," because this can render the whole picture "misleading by virtue of material facts not disclosed." *Lubore,* 109 Md.App. at 341, 674 A.2d 547.

The exact character of the relationship between parties with a tort duty to each other varies greatly, but this relationship is often dependent upon the third requirement of a claim for negligent misrepresentation, namely the defendant's knowledge that the plaintiff will probably rely on the information communicated by the defendant.[17] *See, e.g., Giant Food v. Ice King,* 74 Md.App. 183, 189, 536 A.2d 1182 (1988). In fact, even in the absence of a contractual, business or other professional relationship, it is still possible for a plaintiff to recover under a theory of negligent misrepresentation by simply claiming reliance upon the "negligent words ... of another, [who] negligently [volunteered] an errone-

ous opinion intending that it be acted upon and knowing that loss or injury are likely to follow if acted upon." *Virginia Dare Stores, Inc. v. Schuman,* 175 Md. 287, 291–92, 1 A.2d 897 (1938). The injured party's reliance is a necessary requirement of a claim of negligent misrepresentation. *See Gross,* 332 Md. at 261, 630 A.2d 1156 (finding that "negligent misrepresentation will not lie, even if a duty exists, if the party to whom the false statement is made did not rely on it.").

Maryland courts have found many different types of situations to be sufficient for purposes of establishing the necessary relationship and reliance between the parties. *See, e.g., Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 338 n. 7, 439 A.2d 534 (1982) ("consummation of an arm's length negotiation"); *Giant Food,* 74 Md.App. at 190, 536 A.2d 1182 ("communications that extended over a period of seven months ... involving a prospective pecuniary interest on the part of both parties"); *Lubore,* 109 Md.App. at 337, 674 A.2d 547 ("employment negotiations between two high-level executives"). In *Council of Co-Owners Atlantis Condominium, Inc. v. Whiting–Turner Contracting Co.,* 308 Md. 18, 37, 517 A.2d 336 (1986), the Court of Appeals of Maryland determined that, when a developer or vendor transfers property upon which a dangerous condition exists, "the vendor's duty to third parties and to the vendee will survive the sale and transfer if the vendor knew or had reason to know of the condition and of the risk involved, and failed to disclose that information to the vendee." This tort duty remains with the vendor "only until the vendee has notice of the condition and

---

17. The second requirement of a claim for negligent misrepresentation, that the defendant intends the negligent statement to be acted upon, is usually not a source of dispute between the parties, as is the case here. Therefore, this Opinion will not discuss any cases which have addressed this issue.

a reasonable opportunity to take precautions against it." *Id.* (footnote omitted).

The Ryan Defendants do not argue that plaintiffs have not satisfied the fourth and fifth requirements for proof of a claim for negligent misrepresentation. The Property Tax Assessment Appeals Board for Howard County has reduced the assessed value of plaintiffs' homes by approximately 30% because of their location on or near a source of methane gas. Moreover, the Ryan Defendants' own real estate appraiser acknowledges that the homes of at least five plaintiffs have decreased in value between 10% and 15% as a result of being located directly above the reclaimed quarry. In addition, there is testimony that each family would not have purchased a home in Calvert Ridge if they were aware of the presence of the reclaimed quarry.

The facts of this case indicate that the Ryan Defendants have been in the business of building residential dwellings for many years and that on at least one previous occasion they encountered a methane problem similar to one occurring here. In 1989 and 1990, the Ryan Defendants were building the Brentwood Park Condominiums in Harford County Maryland when they were advised to discontinue construction because methane gas was migrating under their building site from a nearby landfill. Construction permits were consequently suspended in order to allow for a remediation system to be designed and implemented. In 1996, the Ryan Defendants became aware that the homes being built at Calvert Ridge were being constructed over or adjacent to a reclaimed quarry. However, they never disclosed this fact to plaintiffs until September 2, 1998, when three non-plaintiff houses had to be evacuated because elevated levels of methane were detected. Before purchasing their homes, plaintiffs spoke with the Ryan Defendants' sales representative on many occasions. Nine plaintiff families were told that the Calvert Ridge property had previously been used as farm or horse farm. Neither these plaintiffs nor the remaining five other plaintiff families were ever told anything about the prior use of the property as a quarry.

■ As noted hereinabove, Maryland courts have predicated liability for negligent misrepresentation upon a duty that arose as a result of "an arm's length negotiation," *Martens Chevrolet,* 292 Md. at 338 n. 7, 439 A.2d 534, as well as one arising as a result of "communications involving a prospective pecuniary interest." *Lubore,* 109 Md.App. at 337, 674 A.2d 547. Viewing the facts of this case in a light most favorable to plaintiffs, this Court concludes that a jury could reasonably infer that the real estate transactions at issue here created a sufficiently "intimate nexus between the parties," *Jacques,* 307 Md. at 533, 515 A.2d 756, for tort liability to arise as a result of the Ryan Defendants' omissions.

Even without establishing a close relationship between the parties, evidence of methane at the Harford County site suggests that the Ryan Defendants may have had reason to know of a potential similar problem at Calvert Ridge but failed to disclose that fact to the plaintiffs. A rational jury could on the record here find that the Ryan Defendants should have been aware of possible adverse conditions at Calvert Ridge but failed to disclose that information to plaintiffs, thereby imposing liability upon the Ryan Defendants for negligent misrepresentation under the holding in *Council of Co–Owners Atlantis Condominium,* 308 Md. at 37, 517 A.2d 336. It will be for the jury to determine whether the Ryan Defendants had an obligation to speak and failed to do so and whether such conduct constituted an implied negligent misrepresentation under all

the circumstances here. *See Leonard,* 289 Md. at 213–14, 424 A.2d 336.

In sum, this Court concludes that plaintiffs have presented sufficient evidence indicating that there are disputes of material facts concerning plaintiffs' claim of negligent misrepresentation. The Ryan Defendants' motion for summary judgment will accordingly be denied as to Count VII.

■■■ Count XII asserts a claim of negligence. To establish a cause of action for negligence in Maryland, a plaintiff must prove four elements: (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the duty was breached by the defendant, (3) that the plaintiff suffered an actual injury or damage, and (4) that the injury or damage was proximately caused by the defendant's breach of the duty. *Richwind,* 335 Md. at 670, 645 A.2d 1147. In *Council of Co–Owners Atlantis Condominium,* 308 Md. at 22, 517 A.2d 336, the Court of Appeals determined that "the duty of builders and architects to use due care in the design, inspection, and construction of a building extends to those persons foreseeably subjected to the risk of personal injury because of a latent and unreasonably dangerous condition resulting from that negligence." *Id.* at 22, 517 A.2d 336.

In cases involving the existence of a defective condition on premises, courts have often applied the "reason to know" test. *See Hayes,* 841 F.Supp. at 710–11; *Brown v. Dermer,* 357 Md. 344, 361–62, 744 A.2d 47 (2000); *Richwind,* 335 Md. at 677, 645 A.2d 1147. As the Court of Appeals stated in *Richwind:*

> Reason to know means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his

conduct would be predicated upon the assumption that the fact did exist. *Id.* at 677, 645 A.2d 1147.

■■■ Applying these principles to the facts or record here, this Court concludes that plaintiffs have produced sufficient evidence upon which a jury might reasonably rely in finding that the Ryan Defendants did not exercise due care in their sale of homes to plaintiffs. As mentioned above, the Ryan Defendants' experience in the industry coupled with their prior knowledge of a methane problem in Harford County suggest, inferentially, that they may have had reason to suspect that the existence of the reclaimed quarry might lead to the generation of methane and might result in injuries or damage to plaintiffs and their homes. At the very least, a dispute of material fact exists concerning whether the Ryan Defendants should have more fully investigated the contents of the reclaimed quarry at Calvert Ridge and whether such failure constituted a lack of due care on their part.

Accordingly, this Court concludes that evidence of negligence in the record here is at least "meager" and is therefore sufficient "to carry the case to the jury." *Fowler,* 240 Md. at 246, 213 A.2d 549. Accordingly, plaintiffs' claim in Count XII should be presented to the jury at the trial of this case. The Defendants' motion for summary judgment as to plaintiffs' claim of negligence in Count XII will therefore be denied.

(h)

*Emotional Distress Damages*

■■■ The Ryan Defendants argue that plaintiffs' evidence of alleged emotional distress arising from the methane problems at Calvert Ridge is insufficient as a matter of law for seventeen individual plaintiffs. There is no merit to this argument.

The Ryan Defendants attempt to support their contention by quoting language from *Vance v. Vance*, 286 Md. 490, 494, 408 A.2d 728 (1979), in which the Court of Appeals of Maryland *permitted* a plaintiff to recover damages for mental harm resulting from her husband's negligent misrepresentation that he was legally divorced from his first wife at the time of their marriage to each other. In particular, Defendants argue that a plaintiff cannot recover for emotional distress unless there is either a physical manifestation of injury or an "objective determination" that injury has occurred. *Id.* at 500, 408 A.2d 728. The Ryan Defendants note that the plaintiff in *Vance* had physical symptoms of distress such as "unkempt hair, sunken cheeks and dark eyes." *Id.* at 501, 408 A.2d 728.

But plaintiffs here have presented evidence of an objective determination that they are suffering from mental distress. In *Vance,* the plaintiff's only evidence of her emotional distress was her appearance and her testimony along with that of her mother and son. Although no medical evidence was presented to the jury, the Court of Appeals still permitted plaintiff to recover damages for emotional distress.[18] Here, three experts have examined plaintiffs and have concluded that they are suffering from some degree of emotional distress as a result of conditions at Calvert Ridge. As stated in *Vance,* "a plaintiff can sustain an action for ... symptoms clearly indicative of a resultant pathological, phys-

iological, or *mental state.*" *Id.* at 500, 408 A.2d 728 (internal quotations and citations omitted) (emphasis added).

Based on facts of record here, the Court concludes that plaintiffs have pursuant to *Vance* presented sufficient "evidence indicative of a ... mental state" for their claim for damages for mental harm to go forward. Accordingly, plaintiffs will be permitted to present evidence of their emotional distress to the jury.

### (i)

### *Summary*

For the reasons stated herein, this Court will grant the Ryan Defendants' motion for summary judgement as to Counts I, III, V, VI, VIII, IX, X and XI, but will deny the Ryan Defendants' motion for summary judgement as to Counts VII and XII. Plaintiffs' motions for partial summary judgment will be denied as to Counts, I, VIII, IX and X.

### V

### *Motions for Summary Judgement Addressing Cross–Claims*

The Ryan Defendants have filed an amended cross-claim against the Brantly Defendants and Marshalee.[19] Presently pending before the Court are three separate motions for summary judgment filed by the Brantly Defendants and Marshalee. Each of the three motions has been filed by two different entities.

---

**18.** The Court even noted that "injury related to matters of common experience and knowledge ... [are] within the competence of ordinary lay persons to determine." *Id.* at 503–04, 408 A.2d 728.

**19.** The original complaint named Brantly Development Corporation and The Liparini Company ("Liparini") as defendants, and the Ryan Defendants' original cross-claim accordingly included both Brantly Development

Corporation and Liparini as cross-defendants along with the six cross-defendants mentioned herein. The amended complaint, however, did not name Brantly Development Corporation, Liparini or Marshalee as defendants. Nevertheless, The Ryan Defendants retained Marshalee as a cross-defendant in its amended cross-claim, even though Marshalee was no longer a direct defendant.

### (a)

*The Ryan Defendants' Cross–Claims Against the Brantly Defendants and Marshalee*

According to their amended cross-claim, the Ryan Defendants purchased lots from both Marshalee and Brantly Development pursuant to the Contract of Sale. It is further alleged that Brantly Development was also a party to the Land Development Contract. The Ryan Defendants assert that both the Land Development Contract and the Contract of Sale obligated Marshalee and Brantly Development to develop and improve lots that the Ryan Defendants later sold to certain plaintiffs, and to develop and improve the Calvert Ridge subdivision where these lots were located. The Ryan Defendants also claim that John Liparini and Nick Liparini supervised and directed Marshalee, Brantly Development and the other Brantly Cross–Defendants in these activities, including the preparation of the pads upon which plaintiffs' homes were to be built.

Count I asserts against Marshalee and Brantly Development a claim for breach of warranty which will arise if the Ryan Defendants are adjudicated to be liable to any or all plaintiffs in this litigation. This Count is based upon language in the Land Development Agreement in which Marshalee and Brantly Development allegedly warrant that "each of the lots is stable and otherwise suitable for the construction of a residential structure by customary means and without extraordinary site preparation measures" and that "all of the streets … are and will be in compliance with the applicable requirements of law, of good quality and suitable for their intended purpose …."

Count II asserts against Marshalee and Brantly Development a claim for express indemnity which arises if the Ryan Defendants are adjudicated to be liable to any or all plaintiffs in this litigation. Specifically, the Ryan Defendants seek indemnity pursuant to the following language from the Land Development Contract:

The warranties set forth above will survive the conveyance of the Lots and will be for the benefit of the Ryan Defendants and its successors and assigns. In addition to the other remedies available to the Ryan Defendants at any time, the Contractor will indemnify the Ryan Defendants for, and will save it harmless from all claims of damages, suits for injunctive relief and other proceedings and costs of any kind which may be asserted or incurred at any time hereafter by reason of any allegation or occurrence which is proven to be true and would involve a breach of any of the warranties provided above and has occurred during Contractor's ownership.

All of the foregoing covenants, warranties and representations will be effective, repeated and true at the time of settlement on each Lot.

In Count III, the Ryan Defendants assert claims against all of the Brantly Defendants and Marshalee for indemnity and contribution, arising if the Ryan Defendants are adjudicated to be jointly or severally liable to any or all plaintiffs. This Count does not specifically allege a basis upon which the Ryan Defendants seek indemnity or contribution from the Brantly Defendants and Marshalee.

### (b)

*Count I—Breach of Warranty and Count II—Express Indemnity*

 Marshalee argues that it is not a proper party to the Ryan Defendants' amended cross-claim because Marshalee was not named as a defendant in plaintiffs'

amended complaint.[20] This argument is meritless.

The Court is satisfied that the Ryan Defendants may maintain their amended cross-claim against Marshalee even though plaintiffs' removal of Marshalee as a defendant in the amended complaint constituted a dismissal of Marshalee under Rule 41(a)(2), F.R.Civ.P. *See Dee–K Enterprises v. Heveafil Sdn. Bhd.,* 177 F.R.D. 351, 355–56 (E.D.Va.1998). It is undisputed that the Ryan Defendants' original cross-claim against Marshalee was properly brought pursuant to Rule 13(g), F.R.Civ.P. At the time, Marshalee and the Ryan Defendants were co-parties since they both had been named as defendants in the original complaint. However, the subsequent dismissal of Marshalee as a defendant in the amended complaint does not require this Court to also dismiss the Ryan Defendants' valid cross-claim which was previously interposed against Marshalee. *See Bell v. Owen Thomas, Inc.,* 115 F.R.D. 299, 301 (W.D.Va.1987); *Land v. Highway Construction Co.,* 64 Haw. 545, 645 P.2d 295, 297–98; 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 1431, at 234 (2d ed.1987). Accordingly, this Court will deny Marshalee's motion for summary judgment as to Counts I and II.

█ Brantly Development argues that Counts I and II should be dismissed as to it because it was not a party to either the Contract of Sale or the Land Development Contract. However, as a general partner in Marshalee, Brantly Development is liable for any obligations arising under both the Contract of Sale and the Land Development Contract executed by Marshalee. Although Marshalee is a limited partnership, Brantly Development still ·"has the rights and powers and is subject to the restrictions and liabilities of a partner in a partnership." Md.Code Ann., Corps. & Ass'ns § 10–403 (2000). Under Maryland partnership law, Brantly Development is "liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law." Md.Code Ann., Corps. & Ass'ns § 9A–306 (2000). Therefore, even though Brantly Development was not an official party to either the Contract of Sale or the Land Development Contract, it is still "jointly liable for the contractual debts and obligations of the partnership." *Bennett Heating & Air Conditioning, Inc. v. NationsBank of Maryland,* 103 Md.App. 749, 769, 654 A.2d 949 (1995).

Accordingly, this Court will deny Brantly Development's motion for summary judgment as to Counts I and II.

(c)

### Count III—Contribution and/or Indemnity

█ For the reasons stated hereinbelow, this Court will grant in part and deny in part the Brantly Defendants' and Marshalee's motion for summary judgment as to Count III of the Ryan Defendants' cross-claim. Specifically, the Brantly Defendants' and Marshalee's motion as to the Ryan Defendants' cross-claim for contribution will be granted, and the Brantly Defendants' and Marshalee's motion as to the Ryan Defendants' cross-claim for indemnity will be granted in part and denied in part.

According to the "Joint Tortfeasor Release, Settlement and Confidentiality Agreement" (the "Agreement") executed by them, all of the Brantly Defendants and Marshalee have settled all claims brought

---

**20.** As previously mentioned, Counts I and II are asserted against only Brantly Development and Marshalee. Count III, asserting claims for contribution and/or indemnity, is brought against all Brantly Defendants and Marshalee.

against them by the Ryan Families in this case, and the Ryan Families have dismissed their amended complaint against the Brantly Defendants.[21] According to the Agreement, "[i]t is agreed and understood by the [Ryan Families] and the Brantly [Defendants and Marshalee] that the effect of this Agreement is to extinguish any right of contribution against the Brantly [Defendants and Marshalee] in accordance with Section 3–1405 of the [Maryland Uniform Contribution Among Joint Tortfeasors Act]." Section 3–1405 states:

A release given by the injured person of one joint tortfeasor does not relieve the joint tortfeasor from liability to make contribution to another joint tortfeasor unless the release: (1) Is given before the right of the other tortfeasor to secure a money judgment for contribution has accrued; and (2) Provides for a reduction, to the extent of the pro rata share of the released tortfeasor, of the injured person's damages recoverable against all other tortfeasors.

Md.Code. Ann., Cts. & Jud. Proc. (2000)

Since the circumstances of this case satisfy the requirements of Section 3–1405, the Ryan Defendants' right of contribution asserted against the Brantly Defendants and Marshalee has been extinguished. Under section 3–1402(b) of the Maryland Uniform Contribution Among Joint Tortfeasors Act ("the Act"), "[a] joint tortfeasor is not entitled to a money judgment for contribution until the joint tortfeasor has by payment discharged the common liability or has paid more than a pro rata share of the common liability." *See also Southern Maryland Oil Co. v. Texas Co.*, 203 F.Supp. 449 (D.Md.1962) (holding that the right to contribution is a statutory right

that accrues at the time of payment.) Accordingly, the Brantly Defendants and Marshalee have satisfied the requirement of § 3–1405(1) because the Ryan Defendants have yet to make any payments to plaintiffs and the Agreement was executed as of October 30, 2000.

As to the second requirement under § 3–1405, Paragraph 2 of the Agreement states:

The [Ryan Families] further agree that all claims or damages recoverable or verdict obtained by them against anyone other than the Brantly [Defendants and Marshalee], are hereby reduced under the provisions of [the Act], to the extent of the statutory pro rata share under [the Act], or in an amount equal to the monetary consideration paid for in this Agreement, whichever is greater, to the extent the Brantly [Defendants and Marshalee] are determined to be joint tortfeasors within the meaning of Section 3–1401 of [the Act].

This language indicates that the Agreement "[p]rovides for a reduction, to the extent of the pro rata share of the released tortfeasor, of the injured person's damages recoverable against all other tortfeasors." § 3–1405(2). Therefore, to the extent that the Brantly Defendants and Marshalee are found to be joint tortfeasors with the Ryan Defendants, the Brantly Defendants and Marshalee are protected against the claim for contribution asserted by the Ryan Defendants. *See, e.g., Chilcote v. Von Der Ahe Van Lines*, 55 Md.App. 291, 295, 462 A.2d 536 (1983), *aff'd*, 300 Md. 106, 476 A.2d 204 (1984); *Martinez v. Lopez*, 54 Md.App. 414, 420, 458 A.2d 1250 (1983).

---

**21.** The Brantly Defendants and Marshalee have also entered into a settlement agreement with the three Brantly Families, none of whom have brought any claims against the Ryan Defendants. Therefore, the Brantly Families' settlement agreement is not in any way relevant to the Ryan Defendants' cross-claim for contribution.

There is similarly no merit to the Ryan Defendants' claim asserted against Brantly Development and Marshalee for contribution arising out of their contractual obligations under the Contract of Sale and the Land Development Contract. Contrary to the arguments advanced by the Ryan Defendants, Brantly Development, Marshalee, and the Ryan Defendants are not co-obligors to third parties because Brantly Development and Marshalee did not clearly intend that the warranties and representations contained in the contracts would benefit plaintiffs. Throughout the Land Development Contract, Marshalee expressly states that it "represents, warrants and covenants *to Ryan Defendants*" that it will perform various duties "for the *benefit of the Ryan Defendants.*" (Emphasis added). Nor are plaintiffs third-party beneficiaries of either contract. Moreover, to the extent that the Land Development Contract contains a valid express indemnity provision in favor of the Ryan Defendants, there is no need for the Ryan Defendants to seek contribution because they are entitled to indemnity from Marshalee and Brantly Development if they are found to be liable to the plaintiffs. Accordingly, this Court will grant the Brantly Defendants' and Marshalee's motions for summary judgment as to the Ryan Defendants' claim for contribution asserted against them in Count III.

With respect to the Brantly Defendants and Marshalee's motions for summary judgment as to the Ryan Defendants' claims for indemnity under Count III, this Court will deny the motions of Brantly Development, Marshalee, John Liparini and Nick Liparini but will grant the motion of both Brantly Management and Nantucket.

In Count III of their amended cross-claim, the Ryan Defendants seek contribution and/or indemnity from, *inter alia,* Brantly Management and Nantucket. Maryland law recognizes a right to indemnity independent of any contract where the character of one tortfeasor's conduct is significantly different from that of another who is also liable for the same damages. *Pyramid Condominium Ass'n v. Morgan,* 606 F.Supp. 592, 595 (D.Md.1985). In this case, Brantly Management and Nantucket are not "also liable for the same damages" as the Ryan Defendants, and the Ryan Defendants are therefore not entitled to indemnification from them. *Id.*

On the record here, it is undisputed that Brantly Management and Nantucket did not enter into any contracts with the Ryan Defendants and did not develop or improve any lots in the Calvert Ridge subdivision. Accordingly, the Ryan Defendants are not entitled to indemnification from Brantly Management and Nantucket because these parties are not liable to plaintiffs for any damages. *See Id.*

The cross-claims against John and Nick Liparini as individuals are based on somewhat different grounds. It is alleged that the Liparinis can be held personally liable in tort because they directly controlled, supervised and committed the negligent acts that have caused plaintiffs' injuries. This Court would agree. As a result, the motion for summary judgment of John and Nick Liparini is denied as to the Ryan Defendants' claim for indemnity.[22]

In *St. James Constr. Co., v. Morlock,* 89 Md.App. 217, 223, 597 A.2d 1042 (1991), the court reiterated the "well established rule that an officer of a corporation may be

---

**22.** However, as previously discussed, John and Nick Liparini's liability for contribution has been extinguished by virtue of their participation in the settlement agreement with plaintiffs.

held personally liable for torts committed by the corporation if the officer '*either specifically directed, or actively participated or cooperated in*' the corporation's negligent conduct." (quoting *Fletcher v. Havre De Grace Fireworks Co.*, 229 Md. 196, 201, 183 A.2d 386 (1962)) (Emphasis in original). In *Brock Bridge Ltd. P'ship, Inc. v. Development Facilitators, Inc.*, 114 Md.App. 144, 163, 689 A.2d 622 (1997), the · president of a contracting corporation was found personally liable for negligently misrepresenting the costs of a construction project because the plaintiffs had relied upon the defendant's engineering expertise for an accurate estimate.

There is evidence in the record here indicating that both John and Nick Liparini were closely involved in day-to-day activities at Calvert Ridge. Nick Liparini himself assisted in the clearing, grading and excavating of soil at the site, and John Liparini was directly responsible for Nick's work and the overall progress of the project. Accordingly, John and Nick Liparini's motion for summary judgment will be denied as to the indemnity claim brought against them inasmuch as there are facts of record indicating that they both "actively participated" in the allegedly negligent conduct which occurred during the development of Calvert Ridge.

Finally, Brantly Development and Marshalee might on the record here be found to be liable to plaintiffs for their actions in connection with the Calvert Ridge subdivision. Moreover, the Ryan Defendants' "conduct, although negligent, [could be] considered to be passive or secondary," and therefore, the Ryan Defendants "may be entitled to receive indemnification." *Id.* However, this common law claim for indemnification is relevant only to the extent that the Ryan Defendants are not able to prevail on their claim for express indemni-

fication under the terms of the Land Development Contract.

For all these reasons, this Court will grant in part and deny in part the three pending motions for summary judgment of the Brantly Defendants and Marshalee: (1) the motion of Brantly Development and Marshalee will be granted as to Count III for contribution, but denied as to Counts I and II, and as to Count III for indemnity; (2) the motion of Brantly Management and Nantucket will be granted as to Count III for both contribution and indemnity and (3) the motion of John and Nick Liparini will be granted as to Count III for contribution but denied as to Count III for indemnity.

(d)

*The Brantly Defendants' Cross–Claims Against the Ryan Defendants*

The Brantly Defendants allege that the Ryan Defendants are responsible for the injuries and damages alleged by plaintiffs, and "under general equitable principles ... the Brantly Defendants are entitled to indemnity and/or contribution from [the Ryan Defendants] to the extent that any liability is found to exist on the part of the Brantly Defendants towards the plain-tiffs." Presently pending before the Court is the Ryan Defendants' motion for partial summary judgment as to the Brantly Defendants' cross-claim for indemnification.

The Ryan Defendants seek summary judgment only as to the Brantly Defendants' cross-claim for indemnification and advance no arguments opposing the Brantly Defendants' cross-claim for contribution. It is argued that the Brantly Defendants were actively negligent in developing, testing and preparing the lots at Calvert Ridge, and that they therefore cannot prevail on their claim of indemnification because only a passive or secondary tortfeasor is entitled to indemnification. According to the Ryan Defendants, the

Brantly Defendants are the main tortfeasors because they created the hazardous conditions at Calvert Ridge by not properly preparing the building pads. It is argued by the Ryan Defendants that, even if they are considered to be *in pari delicto* with the Brantly Defendants, the Brantly Defendants' claim must still fail because Brantly Development must indemnify the Ryan Defendants based upon the language of the Land Development Agreement.

█ Granting indemnification to a party subject to a tort claim involves the "shifting of the entire loss from the party who paid the judgment to the tortfeasor who should in fairness bear it." *Board of Trustees of Baltimore County Community Colleges v. RTKL Associates, Inc.*, 80 Md. App. 45, 55, 559 A.2d 805 (1989). The parties must have "some sort of relationship prior to the tort which justifie[s] the claim for indemnity," and "a party is only entitled to indemnification when the party's actions, although negligent, are considered to be passive or secondary to those of the primary tort-feasor." *Id.* at 55–56, 559 A.2d 805; *see also Pyramid*, 606 F.Supp. at 595. "It is well-established under Maryland law that one who is guilty of active negligence cannot obtain tort indemnification." *Franklin v. Morrison*, 350 Md. 144, 163, 711 A.2d 177 (1998).

The Brantly Defendants have now settled with all plaintiffs, and all claims of the plaintiffs against them have been dismissed. Pursuant to separate settlement agreements, the Brantly Defendants have compensated the Brantly Families, but they have not compensated the Ryan Families. Consequently, the only loss that the Brantly Defendants can shift to the Ryan Defendants is the amount that has already been paid in settlement to the Brantly Families because all other liability to plaintiffs has been extinguished.

The Brantly Defendants have pointed to no evidence in the record here indicating that the Ryan Defendants have any liability with respect to injuries suffered by the Brantly Families. Although the Ryan Defendants and the Brantly Defendants had some sort of relationship prior to the discovery of elevated levels of methane gas at Calvert Ridge, nothing in the record indicates that the Ryan Defendants had any responsibility whatsoever with respect to the homes or yards of the Brantly Families. Therefore, any injury or damages suffered by the Brantly Families must have been caused by the active negligence of the Brantly Defendants. One "who is guilty of active negligence cannot obtain tort indemnification." *Franklin*, 350 Md. at 163, 711 A.2d 177 (1998).

Under the circumstances here, the Brantly Defendants are not entitled to indemnification by the Ryan Defendants. Accordingly, the motion of the Ryan Defendants for summary judgment will be granted as to the cross-claim for indemnification asserted against them by the Brantly Defendants.

## VI

### *Motion for Summary Judgment of Third–Party Defendant Gutschick*

There is also pending before the Court in this case a motion *for summary judgment filed by third-party defendant Gutschick. For the reasons stated herein, Gutschick's motion for summary judgment* will be denied.

#### (a)

##### *Background Facts*

On October 16, 2000, Brantly Development and Nantucket filed an amended third-party complaint against Gutschick seeking indemnity and/or contribution from Gutschick to the extent that Brantly

Development and/or Nantucket are found to be liable to the Ryan Defendants and/or to any or all plaintiffs.[23] The amended third-party complaint asserts claims of breach of contract and negligence.

Gutschick is a civil engineering, surveying, and planning firm which designed and planned the Calvert Ridge subdivision, including the placement of roads, building lots and utilities. In 1989, Gutschick entered into a contract with Helen O'Connor for civil engineering services related to the development of the Calvert Ridge subdivision. On August 23, 1995, Brantly Development contracted with Gutschick for civil engineering "stake-out" services throughout the Calvert Ridge subdivision. Almost one year later, on August 6, 1996, Brantly Development again contracted with Gutschick for civil engineering services related to partitioning one lot within the subdivision. On August 28, 1997, Nantucket entered into a contract with Gutschick for civil engineering stake-out services related to three particular lots within Calvert Ridge.

### (b)
### Claims Against Gutschick

According to the amended third-party complaint, Gutschick was directly responsible for designing the development plans for the Calvert Ridge subdivision. Specifically, it is alleged that Gutschick prepared a "Soils Map" in May of 1989, a "Preliminary Plan" in April of 1990, and a "Final Plat" in February of 1992, all of which proposed the construction of public roads and residential homes on top of and beside the quarry. Brantly Development claims that once Howard County approved Gutschick's Final Plat for Calvert Ridge, it

was required to develop the subdivision in accordance with Gutschick's design.

In Count I of the amended third-party complaint, it is alleged that Gutschick breached its contractual obligation to Brantly Development and Nantucket by failing to determine the suitable placement of improvements in the Calvert Ridge subdivision. In Count II, it is asserted that Gutschick was negligent in its duty to carefully advise Brantly Development, Nantucket and foreseeable end users of suitable locations for improvements in the Calvert Ridge subdivision.

### (c)
### Applicable Law

For Gutschick to be liable to Brantly Development and/or Nantucket, Gutschick must have breached a duty it owed to them. *See Krieger v. J.E. Greiner Co.*, 282 Md. 50, 56, 382 A.2d 1069 (1978). Such liability "would have to arise by virtue of a duty under contract, conduct, or law." *Id.* at 57, 382 A.2d 1069. According to the amended third-party complaint, Gutschick's duty arose under various contracts as well as by way of Gutschick's conduct in connection with its overall design of Calvert Ridge and the placement of certain houses within that design. Gutschick's contractual duty was to Brantly Development and/or Nantucket, while its general tort duty was to Brantly Development, Nantucket, and other foreseeable parties, like the plaintiffs. *See Council of Co-Owners*, 308 Md. at 18, 517 A.2d 336.

With respect to the existence of a tort duty, Maryland law follows the "modern trend" in that "privity is not an absolute prerequisite." *Id.* at 32, 517 A.2d 336.

---

**23.** Despite the fact that the Ryan Defendants' cross-claims against Nantucket have here been dismissed and the fact that plaintiffs' claims against Nantucket were previously dismissed, Nantucket is not in this case precluded from seeking indemnity and/or contribution from the Ryan Defendants for compensation paid by it to the Brantly Families in settlement of their claims.

"The nature and extent of a tort duty recognized by law depends in part on the status of the party upon whom it is sought to be imposed, and upon his relationship to the party claiming the benefit of it." *Id.* at 36, 517 A.2d 336. "[T]he duty of builders and architects to use due care in the design, inspection, and construction of a building extends to those persons foreseeably subjected to the risk of personal injury because of a latent and unreasonably dangerous condition resulting from that negligence." *Id.* at 22, 517 A.2d 336. In situations where "the dangerous condition is discovered before it results in injury, an action in negligence will lie for the recovery of the reasonable cost of correcting the condition." *Id.*

■ To the extent that the third-party negligence claim brought against Gutschick actually derives from plaintiffs' claims against the Ryan Defendants, Brantly Development and Nantucket, it is necessary to consider the applicable law pertaining to Brantly Development's and Nantucket's liability to plaintiffs. When a developer or vendor transfers property upon which a dangerous condition exists, "the vendor's duty to third parties and to the vendee will survive the sale and transfer if the vendor knew or had reason to know of the condition and of the risk involved, and failed to disclose that information to the vendee." *Council of Co–Owners*, 308 Md. at 37, 517 A.2d 336. This tort duty remains with the vendor "only until the vendee has notice of the condition and a reasonable opportunity to take precautions against it." *Id.* (footnote omitted).

In *Council of Co–Owners*, the Court of Appeals stated that "a strong argument may be advanced in favor of the recognition of a nondelegable duty on the part of the developer with respect to unreasonably dangerous conditions created as a result of the development ...." *Id.* at 39, 517 A.2d

336. "Where the developer has been guilty of no independent negligence and is made to respond in damages solely by reason of vicarious liability resulting from the nondelegable nature of [his] duty, he will have a right to indemnity from an independent contractor employed by him whose negligence actually caused the breach." *Id.* at 41, 517 A.2d 336.

■ Brantly Development's and Nantucket's right to indemnity from Gutschick as an "independent contractor" is based upon the claim that Gutschick's negligence caused the unreasonably dangerous condition. An engineer is negligent if he or she does not use that degree of care and skill which a reasonably competent professional person acting in similar circumstances would use. MPJI § 27:7. "Although there may be some situations that necessitate expert testimony relative to the standard of care required," such expert testimony as to degree of care is not needed where the average juror would know the defendant's conduct ordinarily was not that of a prudent person. *Free State Bank & Trust v. Ellis*, 45 Md.App. 159, 163, 411 A.2d 1090 (1980).

The applicable law pertaining to Gutschick's contractual duty to Brantly Development and Nantucket cannot be accurately determined here because none of the parties have submitted copies of the relevant contracts or even quoted any contractual language. The amended third-party complaint broadly alleges that "Gutschick was contractually obligated to Brantly Development and Nantucket to determine the suitable placement of improvements [homes and residential roads] in the Calvert Ridge subdivision." To the extent that this alleged contractual duty is similar to Gutschick's general tort duty, the question of whether Gutschick breached its contracts may be determined by applying the same legal standard as applied to

Brantly Development's and Nantucket's negligence claim. In other words, Gutschick breached its contracts if it did not use that degree of care and skill which a reasonably competent professional engineering firm would use in similar circumstances. MPJI § 27:7. Whether or not expert testimony is required to establish the applicable degree of care depends upon the nature of the other evidence that is presented to the jury. *See Broadwater v. Arch*, 267 Md. 329, 336–37, 297 A.2d 671 (1972); *Free State Bank*, 45 Md.App. at 163, 411 A.2d 1090.

### (d)

### *Discussion*

■ For the reasons stated hereinbelow, this Court will deny Gutschick's motion for summary judgment. Gutschick has not met its burden of showing that there is an absence of evidence to support the claims of Brantly Development and Nantucket. Viewing the facts and all reasonable inferences in a light most favorable to Brantly Development and Nantucket, this Court concludes that there are disputed issues of material fact which indicate that Gutschick may be liable under the claims of negligence and breach of contract asserted against it.

Brantly Development and Nantucket have pointed to competent evidence that Gutschick's engineering services in connection with the design and planning of the Calvert Ridge subdivision were performed in a negligent manner. Sufficient facts exist to support their claim that unacceptable conditions may have existed at Calvert Ridge, and that such conditions were caused by Gutschick's failure to use the degree of skill and care which a reasonably competent professional engineer would have used in similar circumstances.

■ Contrary to Gutschick's contention, Brantly Development and Nantucket are not required at this stage to specifically identify expert testimony establishing that Gutschick breached the applicable standard of care and that the breach proximately caused plaintiffs' damages. *See Broadwater*, 267 Md. at 335–37, 297 A.2d 671. As long as there is sufficient evidence of record for an average juror to determine that Gutschick's conduct was not that of a prudent person, Brantly Development and Nantucket do not have to present any expert testimony. *See Free State Bank*, 45 Md.App. at 163–64, 411 A.2d 1090. In any event, Brantly Development and Nantucket have pointed to the expert report of Raymond A. DeStephen, P.E., one of plaintiffs' experts. That report indicates that it was not consistent with industry practice for a housing development like that of Calvert Ridge to be located on and around uncontrolled fill, and that the presence of uncontrolled fill has led to a substantial risk of damage to plaintiffs' houses. Furthermore, there is testimony indicating that there are depressions in plaintiffs' yards and in the roads, which Mr. DeStephen believes have been caused by the existence of uncontrolled fill under the Calvert Ridge subdivision.

To establish that its engineering services were not performed in a negligent manner, Gutschick has submitted the affidavit of its own Vice President, who is a professional engineer, along with the affidavit of another professional engineer. Despite the fact that both of these affidavits declare that Gutschick met its contractual obligations and satisfied the appropriate standard of care, there is evidence in the record here which challenges the validity of such conclusions. In addition to the expert report and deposition testimony of Mr. DeStephen, the record also contains engineering reports and deposition testimony from several other experts who have opined that plaintiffs' alleged injuries and damages are the result of the initial deci-

sion to place houses, roads, and utility services on or near uncontrolled fill within the Calvert Ridge subdivision. Whether or not a reasonably competent professional engineering firm would have made a similar decision is a determination which should be made by a jury because it involves issues of fact. *See, e.g., Crockett v. Crothers*, 264 Md. 222, 224–26, 285 A.2d 612 (1972) (upholding a jury's finding that defendant's negligent design of a sewerage system was the cause of plaintiffs' damages even though defendant himself, a professional engineer, was the only witness to provide any expert testimony.)

With respect to the third-party plaintiffs' breach of contract claim, Gutschick's motion must likewise be denied because it involves essentially the same issue as does the negligence claim. Although none of the parties have provided the Court with the actual language of the contracts at issue, Gutschick does not dispute that the primary question for this Court to determine is whether or not its engineering services failed to meet the appropriate standard of professional care. As mentioned above, this question involves disputes as to certain factual issues which should be decided by a jury and not by this Court as a matter of law.

█ Finally, this Court will reject Gutschick's argument that Brantly Development and Nantucket have failed to comply with the requirements for filing a malpractice claim against a licensed professional pursuant to subtitle 2C of the Courts and Judicial Proceedings Article of the Code of Maryland. *See* Md.Code Ann., Cts. & Jud. Proc. § 3–2C–01 to 02 (2000). As pointed out by Brantly Development and Nantucket, the applicable statute applies only to a "claim" against a "licensed professional," as defined therein. This suit does not constitute a claim under the statutory language, and Gutschick does not satisfy the statutory definition of a licensed professional.

According to § 3–2C–01(b), a claim "means a civil action, including an original claim, counterclaim, cross-claim, or third-party claim, *originally filed in circuit court* against a licensed professional that is based on the licensed professional's alleged negligent act or omission in rendering professional services, within the professional's license, permit, or certificate, for others." (emphasis added). Quite clearly, this suit is not such a civil action because it was not originally filed in a state circuit court.

Section 3–2C–01(c)(4) defines a licensed professional as a "professional engineer licensed under Title 14 of the Business Occupations and Professions Article." A professional engineer means "*an individual* who practices engineering" and "who is licensed by the board to practice engineering." Md.Code Ann., Bus. Occ. & Prof. §§ 14–101(c), (g) (2000) (emphasis added). Gutschick does not satisfy this definition of a licensed professional because it is a professional association and not an individual.

For these reasons, the Court will deny the motion for summary judgment of third-party defendant Gutschick.

## VII

### *Conclusion*

For all the reasons stated, this Court concludes that some of plaintiffs' claims, some of the parties' cross-claims and both of the third-party claims of Brantly Development and Nantucket should proceed to trial before a jury.

Accordingly, it is this _____ day of March, 2001 by the United States District Court for the District of Maryland

ORDERED:

1. That plaintiffs' motion for partial summary judgment on Count I of

the amended complaint is hereby denied;

2. That plaintiffs' motion for partial summary judgment on Counts VIII, IX and X of the amended complaint is hereby denied;

3. That the motion for summary judgment of the Ryan Defendants is hereby granted as to Counts I, III, V, VI, VIII, IX, X and XI;

4. That the motion for summary judgment of the Ryan Defendants is hereby denied as to Counts VII and XII;

5. That the motion for summary judgment of the Ryan Defendants on the indemnity cross-claim of the Brantly Defendants and Marshalee is hereby granted;

6. That the motion for summary judgment of cross-defendants John Liparini and Nick Liparini on the cross-claims asserted against them is hereby. granted in part and denied in part;

7. That the motion for summary judgment of cross-defendants Brantly Development and Marshalee on the cross-claims asserted against them is hereby granted in part and denied in part;

8. That the motion for summary judgment of cross-defendants Brantly Management and Nantucket on the cross-claims asserted against them is hereby granted; and

9. That the motion for summary judgment of third-party defendant Gutschick on the third-party claims asserted against it by Brantly Development and Nantucket is hereby denied.